## IN THE UNITED STATES BANKRUPTCY COURT
### FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| IN RE: | : | **Bankruptcy No. 19-12655** |
| | : | |
| **LARRY L. WISSER and** | : | |
| **CATHLEEN R. WISSER,** | : | |
| Debtors | : | **Chapter 12** |
| | : | |
| | : | **Hearing Date:  July 16, 2019** |
| | : | **Hearing Time:  12:30 p.m.** |
| | : | |
| | : | **United States Bankruptcy Court** |
| | : | **Courtroom No. 1, The Madison Building** |
| | : | **400 Washington Street** |
| | : | **Reading, PA 19601** |

### MOTION OF NORTHWEST BANK TO DISMISS BANKRUPTCY CASE WITH PREJUDICE, OR IN THE ALTERNATIVE, FOR IN REM RELIEF FROM THE AUTOMATIC STAY TO EXERCISE ITS STATE COURT REMEDIES AGAINST THE DEBTORS' REAL ESTATE LOCATED AT 8281 HOLBENS VALLEY ROAD, NEW TRIPOLI, PENNSYLVANIA

1.      This Motion is made on behalf of Northwest Bank, successor to Union Community Bank, by and through its counsel, Charles N. Shurr, Jr., Esquire and Kozloff Stoudt.

2.      Northwest Bank, successor to Union Community Bank, is a Pennsylvania savings bank with an address of 100 Liberty Street, Warren, Pennsylvania 16365 ("Bank").

3.      Larry L. Wisser and Cathleen R. Wisser are adult individuals with an address of 8149 Bausch Road, New Tripoli, Pennsylvania 18066 (individually and collectively, the "Debtors").

#### *Background*

4.      On or about June 1, 2006 the Debtors executed and delivered to the Bank a Promissory Note in the original principal amount of $465,000.00, which was modified and

amended by Change in Terms Agreements dated July 30, 2009, August 5, 2010, and April 2, 2015 (collectively, the "Note"). A true and correct copy of the Note is attached hereto as Exhibit A and incorporated herein by reference.

5.      To secure repayment of the Note, on or about June 1, 2006 the Debtors executed and delivered to the Bank a Mortgage encumbering the real estate located at and known as 8281 Holbens Valley Road, New Tripoli, Pennsylvania 18066 ("Real Estate"), which was recorded on July 5, 2006 with the Recorder of Deeds of Lehigh County as Document No. 7351866 ("Mortgage"). A true and correct copy of the Mortgage is attached hereto as Exhibit B and incorporated herein by reference.

6.      The Bank has not assigned the Note or Mortgage (collectively, the "Loan Documents") and is the holder thereof.

7.      The Debtors defaulted on their obligations to the Bank under the Loan Documents due to, without limitation, delinquent loan payments.

8.      On August 2, 2016 the Bank commenced a mortgage foreclosure action against the Real Estate, which was filed to Docket No. 2016-C-2244, Lehigh County Court of Common Pleas.

9.      Following a nonjury trial, the Court of Common Pleas of Lehigh County entered an Order in favor of the Bank and against the Debtors for the foreclosure and sale of the Real Estate on September 27, 2018 ("Judgment").

10.     After resolution of certain post-trial motions, the Bank proceeded to execute on the Judgment, and a Sheriff's Sale of the Real Estate was scheduled for July 27, 2018.

*First Bankruptcy Case*

11.     On the eve of the Sheriff's Sale and in an effort to frustrate, hinder, and delay the Bank's lawful exercise of the judgment execution process, the Debtors filed Chapter 12 bankruptcy on July 26, 2018 (Case No. 18-14949, E.D. Pa.) ("First Bankruptcy Case").

12.     However, when the Debtors realized they did not have the ability to reorganize, the Debtors consented to relief from the automatic stay in favor of the Bank with regard to the Real Estate on December 20, 2018 and voluntarily converted their Chapter 12 case to a Chapter 7 liquidation case on January 4, 2019.

13.     On January 10, 2019, the Chapter 7 Trustee filed a Motion to Abandon Livestock and Crops, as Debtors had to sell the livestock to ensure their safety and value.

14.     The Trustee's Motion was granted on January 14, 2019, which allowed Debtors to immediately arrange for the sale of the livestock.

15.     The Bank understands that the Debtors sold their livestock and are no longer engaged in farming.

16.     The Debtors subsequently failed to comply with their obligations under the Bankruptcy Code by failing to appear at two (2) scheduled §341 Meetings of Creditors on February 6, 2019 and March 13, 2019.

17.     On March 22, 2019 this Honorable Court entered an Order ("Show Cause Order") requiring the Debtors to appear before the Court on April 25, 2019 and show cause why the First Bankruptcy Case should not be dismissed ("Dismissal Hearing").

18.     However, upon information and belief, the Debtors failed to appear for the Dismissal Hearing, and on April 25, 2019, the Debtors' First Bankruptcy Case was dismissed.

*Second Bankruptcy Case*

19.    On the exact same day, the Debtors filed this bankruptcy case in an effort to frustrate, hinder, and delay the Sheriff's Sale of the Real Estate scheduled for April 26, 2019.

20.    On April 29, 2019, the Debtors filed a Motion to Impose Automatic Stay pursuant to § 362(c)(3), which was denied by Court Order dated May 23, 2019 following a hearing.

21.    On May 9, 2019, the Debtors filed a Motion to Extend Time to File Missing Documents requesting an extension of the deadline to file their Schedules, Statement of Financial Affairs, and Plan to May 23, 2019, which was granted by Order of Court dated May 13, 2019.

22.    On May 21, 2019, the Debtors filed another Motion to Extend Time to File Missing Documents requesting a further extension of the deadline to file their Schedules, Statement of Financial Affairs, and Plan to June 6, 2019, which was granted by Order of Court dated May 22, 2019.

23.    On June 4, 2019, the Debtors filed their Schedules and Statement of Financial Affairs but did not file a Plan.

24.    As of the Petition Date of April 25, 2019, the amount due under the Note was as follows:

| | |
|---|---|
| Outstanding Principal Balance: | $305,795.23 |
| Accrued Interest at the variable Wall Street Journal Prime Rate plus 1.5% per annum, with a minimum rate of 7.0% per annum through 4/25/19: | $ 26,954.68 |
| Late Charges through 4/25/19: | $ 15,945.69 |
| Force-Placed Insurance through 4/25/19: | $  2,617.30 |
| Legal Fees through 4/25/19: | $ 54,780.00 |
| Collection Costs through 4/25/19: | $  8,370.06 |
| Total Amount Due through 4/25/19 | $414,462.96 |

The Debtors are responsible for all additional accrued interest at the contract rate, late fees, collection costs, and attorneys' fees.

### *Motion to Dismiss Case with Prejudice*

### *Ineligibility under §109(f)*

25.     This Motion seeks dismissal of this case, because the Debtors are not eligible for bankruptcy protection under Chapter 12 of the Bankruptcy Code, as they do not qualify as a "family farmer with regular annual income."

26.     Under 11 U.S.C. §109(f) "only a family farmer or family fisherman with regular annual income may be a debtor under chapter 12 of this title."

27.     11 U.S.C. §101(18) defines "family farmer" as an "individual and spouse [who] receive from such farming operation more than 50 percent of such individual's or such individual and spouse's gross income for-- (i) the taxable year preceding; or (ii) each of the 2d and 3d taxable years preceding."

28.     11 U.S.C. §101(19) defines "family farmer with regular annual income" as a "family farmer whose annual income is sufficiently stable and regular to enable such family farmer to make payments under a plan under chapter 12 of this title."

29.     According to the Debtors' Statement of Financial Affairs, in 2018 and 2019 the Debtors did not receive any income from farming, and in 2017 the Debtors received gross income from farming of only $1,468.00, which was less than 50% of their total gross income.

30.     As set forth above, the Bank understands that the Debtors sold their livestock and, thus, are no longer engaged in farming.  This understanding is consistent with the testimony of Cathleen R. Wisser at the Hearing held on May 23, 2019 on the Debtors' Motion to Impose Automatic Stay.

31.    The Bank believes and avers that the Debtors' income from farming as set forth on Bankruptcy Schedule I is based on speculation and conjecture and not actual results of current farming operations.

32.    The Debtors did not provide a supporting statement required by Bankruptcy Schedule I detailing the income and expenses from a farming operation.

33.    Thus, based on the foregoing, the Debtors are not eligible for bankruptcy protection under 11 U.S.C. §109(f), and this case should be dismissed

*Ineligibility under §109(g)(1)*

34.    This Motion seeks dismissal of this case, as the Debtors are not eligible for bankruptcy protection under 11 U.S.C. §109(g).

35.    Under 11 U.S.C. §109(g) "no individual or family farmer may be a debtor under this title who has been a debtor in a case pending under this title at any time in the preceding 180 days if (1) the case was dismissed by the court for willful failure of the debtor to abide by orders of the court, or to appear before the court in proper prosecution of the case...."

36.    A debtor's failure to appear at a meeting scheduled under 11 U.S.C. § 341 is within the scope of 11 U.S.C. §109(g)(1), as it constitutes a failure of the debtor to abide by orders of the court. In re Arena, 81 B.R. 851 (E.D. Pa. 1988).

37.    In this case, the Debtors failed to appear at two (2) scheduled § 341 Meetings of Creditors in the First Bankruptcy Case on February 6, 2019 and March 13, 2019.

38.    The Bank avers that the Debtors' failure to appear at two (2) scheduled § 341 Meetings constitutes willful failure to abide by orders of the court.

39.    Furthermore, upon information and belief the Debtors failed to appear before the court in proper prosecution of their First Bankruptcy Case, as they willfully failed to appear for the Dismissal Hearing as required by the Show Cause Order.

40.    The Bank avers that the Debtors willfully failed to appear for the Dismissal Hearing, so that the First Bankruptcy Case would be dismissed and they could then re-file bankruptcy solely to obtain the benefit of the automatic stay and further delay the Sheriff's Sale of the Real Estate.

41.    Such willful failure to attend the Dismissal Hearing constitutes a failure to properly prosecute the case. Id.

42.    Thus, based on the foregoing, the Debtors are not eligible for bankruptcy protection under 11 U.S.C. §109(g)(1), and this case should be dismissed.

*Cause under 11 USC § 1208(c)*

43.    This Motion seeks dismissal of this case pursuant to 11 USC § 1208(c) for cause, as the Debtors are unable to effectuate a plan of reorganization and have failed to comply with an Order of Court.

44.    Section 1208(c) of the Bankruptcy Code provides as follows:

On request of a party in interest, and after notice and a hearing, the court may dismiss a case under this chapter for cause, including --
(1) unreasonable delay, or gross mismanagement, by the debtor that is prejudicial to creditors;
(2) nonpayment of any fees and charges required under chapter 123 of title 28;
(3) failure to file a plan timely under section 1221 of this title;
(4) failure to commence making timely payments required by a confirmed plan;
(5) denial of confirmation of a plan under section 1225 of this title and denial of a request made for additional time for filing another plan or a modification of a plan;
(6) material default by the debtor with respect to a term of a confirmed plan;
(7) revocation of the order of confirmation under section 1230 of this title, and denial of confirmation of a modified plan under section 1229 of this title;
(8) termination of a confirmed plan by reason of the occurrence of a condition specified in the plan;

(9) continuing loss to or diminution of the estate and absence of a reasonable likelihood of rehabilitation; and
(10) failure of the debtor to pay any domestic support obligation that first becomes payable after the date of the filing of the petition.

45.     The grounds for cause identified in Section 1208(c) of the Bankruptcy Code are not exhaustive, and a court can consider other factors. In re Euerle Farms, Inc., 861 F. 2d 1089 (8th Cir. 1988).

46.     A debtor's inability to effectuate a feasible reorganization plan constitutes cause for dismissal. Id.

47.     It is not necessary to wait until the debtor files a Chapter 12 plan in order for the Court to consider the ability of the debtor to reorganize. In re Ziebarth, 113 B.R. 591 (ND 1990).

48.     Filing a bankruptcy case simply to obtain the benefit of the automatic stay with no reasonable prospect of reorganizing is not an appropriate use of the bankruptcy process and is grounds for dismissal of the case. See In re Krebs, 2001 Bankr. LEXIS 552 (E.D. Pa. 2001).

49.     In this case, the Debtors do not own any livestock and are not engaged in farming.

50.     The Debtors have an aggregate gross monthly income of less than $1,000.00 from their employment at Giant Food Stores. (Debtors' Bankruptcy Schedule I.)

51.     In the First Bankruptcy Case, the Debtors' monthly disposable income was $2,941.00, but the Debtors claim their current monthly disposable income is now $27,110.75.

52.     The Debtors provide no explanation as to how their monthly disposable income has increased over 820%.

53.     The Debtors have provided no explanation or information as to why this new bankruptcy is now feasible, when only six (6) months ago during the First Bankruptcy Case the

Debtors consented to relief from the automatic stay and voluntarily converted their case to a Chapter 7 liquidation.

54.     In addition, cause exists for dismissing this case, as the Debtors failed to file a reorganization plan by June 6, 2019 in violation of the Court Order dated May 22, 2019.

55.     Based on the foregoing, cause exists for dismissing this case pursuant to 11 USC § 1208(c), as the Debtors have no reasonable prospect of reorganizing and have failed to comply with an Order of Court.

## *Basis for Dismissal with Prejudice*

56.     Under 11 U.S.C. § 105 the Bankruptcy Court may "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title … [and may] enforce or implement court orders or rules … to prevent an abuse of process."

57.     Based on the foregoing, the Debtors do not qualify for bankruptcy protection under 11 U.S.C. § 109(f) and 109(g) and filed this bankruptcy case in bad faith, as they have no reasonable prospect of reorganizing.

58.     Thus, this bankruptcy case should be dismissed, and the Debtors should be barred from re-filing a bankruptcy petition for one (1) year from the date of dismissal.

## *Motion for Relief*

59.     In the alternative, this Motion seeks relief from the stay imposed under 11 U.S.C. § 362, so that the Bank may exercise its state court remedies with respect to the Debtors' Real Estate, including, without limitation, executing upon and foreclosing on the Real Estate.

60.     Section 362(d) of the Bankruptcy Code provides that upon request of a party in interest and after notice and a hearing thereon, the court shall grant relief with respect to a stay against property for cause where (i) the interests of a party in such property are not adequately

protected, or (ii) there is no equity in such property and it is not necessary to an effective reorganization.

### *Lack of Adequate Protection*

61.     Cause exists for granting relief from the automatic stay under 11 U.S.C. §362(d)(1), as the Debtors have not offered adequate protection for the Bank's interest in the Real Estate and the Bank's interest in the Real Estate is not adequately protected.

62.     The interest of the Bank in the Real Estate is not adequately protected, as the Debtors have failed to make any payments on the Note since July 2018 and are due for the January 30, 2018 payment and all subsequent payments.

63.     Thus, cause exists for granting relief from the automatic stay, as the Bank's interest in the Real Estate is not adequately protected.

### *Lack of Equity / Inability to Reorganize*

64.     Furthermore, cause exists for granting relief from the automatic stay under 11 U.S.C. § 362(d)(2), as the Debtors do not have equity in the Real Estate and the Real Estate is not necessary for an effective reorganization of the Debtors.

65.     Upon information and belief, the Bank avers that the value of the Real Estate is less than the outstanding indebtedness encumbering the property.

66.     According to the Debtors' Bankruptcy Schedule A/B, the Real Estate has a value of $840,887.00.

67.    However, the total amount of debt secured by the Real Estate exceeds the value of the property, as follows:

| | |
|---|---:|
| Union Community Bank (First-Lien Mortgage): | $ 414,462.96 |
| USDA Farm Service Agency (Second-Lien Mortgage): | $ 521,141.51* |
| Oley Valley Feed, Inc. (Judgment): | $ 39,469.97* |
| Oley Valley Feed, Inc. (Judgment): | $ 46,576.46* |
| Lehigh County Tax Claim Bureau (Taxes): | $ 5,200.56* |
| Weisenberg Township (Taxes): | $ 551.04* |
| Northwestern Lehigh School District (Taxes): | $ 15,283.05* |
| Total: | $ 1,042,685.55 |

* Amount according to the Proof(s) of Claim filed in the First Bankruptcy Case.

68.    Thus, after payment of debts secured by the Real Estate, real estate taxes, municipal liens, and other transaction costs, there is no equity in the Real Estate for the Debtors or for unsecured creditors.

69.    In addition, the Bank believes and avers that the Real Estate is not necessary for an effective reorganization of the Debtors, as the Debtors are unable to reorganize.

70.    The Debtors do not own any livestock and are not engaged in farming.

71.    The Debtors have an aggregate gross monthly income of less than $1,000.00 from their current employment.

72.    The Debtors are not able to reorganize and pay their outstanding obligations.

73.    Based on the foregoing, the Bank is entitled to relief from the automatic stay under 11 U.S.C. § 362 with regard to the Real Estate, as (i) the interest of the Bank in the Real Estate is not adequately protected, and (ii) there is no equity in the Real Estate and it is not necessary to an effective reorganization of the Debtors.

*Basis for In Rem Relief from the Automatic Stay*

74.     This Motion seeks in rem relief from the stay to prevent serial bankruptcy filings by the Debtors for the purpose of further delaying execution against and a Sheriff's Sale of the Real Estate.

75.     As stated herein, the Debtors do not have any equity in the Real Estate and are unable to effectively reorganize.  Nor can they offer adequate protection, now or in the future, for the interest of the Bank in the Real Estate.

76.     The Bank believes and avers that the filing of the within bankruptcy proceeding and the First Bankruptcy Case were part of scheme to delay and hinder the Bank from the lawful exercise of the judgment execution process against the Real Estate.

77.     As a result, the Bank is entitled to an Order granting it in rem relief from the automatic stay pursuant to 11 U.S.C. §362(d)(4)(B), with such relief attaching to the Real Estate for a period of two (2) years from the date of the Order.

78.     The Bank avers that the fourteen (14) day period under Fed. R. Bankr. P. 4001(a)(3) should not apply in this matter.

WHEREFORE, Northwest Bank, successor to Union Community Bank, respectfully requests this Honorable Court enter an Order, substantially in the form of the attached proposed Order either

(a)     dismissing this bankruptcy case and prohibiting the Debtors from re-filing bankruptcy for a period of one (1) year from the date of dismissal; or

(b)     vacating the automatic stay imposed under 11 U.S.C. §362 as to the Bank with respect to the Debtors' Real Estate located at 8281 Holbens Valley Road, New Tripoli, Pennsylvania, so that the Bank may exercise its state court remedies with respect to said Real

Estate, with such relief attaching to the Real Estate for a period of two (2) years from the date of

such Order and authorizing the Bank to record such Order with the real estate records of Lehigh

County, Pennsylvania.

And granting such other and further relief as is just and equitable under the circumstances.

Respectfully Submitted,

**KOZLOFF STOUDT**

By: _____

Charles N. Shurr, Jr., Esquire
2640 Westview Drive
Wyomissing, PA 19610
(610) 670-2552
Attorneys for Northwest Bank

# EXHIBIT A


**UNION NATIONAL
COMMUNITY BANK**

## PROMISSORY NOTE

| Principal | Loan Date | Maturity | Call / Coll | Officer | Initials |
|---|---|---|---|---|---|
| $465,000.00 | 06-01-2006 | 06-05-2026 | 1500 / 0 | 333 | |

References in the shaded area are for Lender's use only and do not limit the applicability of this document to any particular loan or item.
Any item above containing "****" has been omitted due to text length limitations.

**Borrower:**  Larry L Wisser
Cathleen R Wisser
8149 Bausch Road
New Tripoli, PA 18066

**Lender:**  Union National Community Bank
HACC Gold Cafe
1625 Old Philadelphia Pike
Lancaster, PA 17602

---

**Principal Amount:  $465,000.00**                        **Date of Note:  June 1, 2006**

                                                                                        Maturity Date:  June 5, 2026

**PROMISE TO PAY.** Larry L Wisser and Cathleen R Wisser ("Borrower") jointly and severally promise to pay to Union National Community Bank ("Lender"), or order, in lawful money of the United States of America, the principal amount of Four Hundred Sixty-five Thousand & 00/100 Dollars ($465,000.00), together with interest on the unpaid principal balance from June 1, 2006, until paid in full.

**PAYMENT.** Subject to any payment changes resulting from changes in the Index, Borrower will pay this loan in accordance with the following payment schedule: 60 monthly consecutive principal and interest payments in the initial amount of $3,708.32 each, beginning July 5, 2006, with interest calculated on the unpaid principal balances at an interest rate of 7.250% per annum; 179 monthly consecutive principal and interest payments in the initial amount of $4,125.18 each, beginning July 5, 2011, with interest calculated on the unpaid principal balances at an interest rate based on the Wall Street Journal Prime Rate (currently 8.000%), plus a margin of 1.000 percentage points, resulting in an initial interest rate of 9.000%; and one principal and interest payment of $4,124.08 on June 5, 2026, with interest calculated on the unpaid principal balances at an interest rate based on the Wall Street Journal Prime Rate (currently 8.000%), plus a margin of 1.000 percentage points, resulting in an initial interest rate of 9.000%. This estimated final payment is based on the assumption that all payments will be made exactly as scheduled and that the Index does not change; the actual final payment will be for all principal and accrued interest not yet paid, together with any other unpaid amounts under this Note. Unless otherwise agreed or required by applicable law, payments will be applied first to any accrued unpaid interest; then to principal; then to any unpaid collection costs; and then to any late charges. The annual interest rate for this Note is computed on a 365/360 basis; that is, by applying the ratio of the annual interest rate over a year of 360 days, multiplied by the outstanding principal balance, multiplied by the actual number of days the principal balance is outstanding. Borrower will pay Lender at Lender's address shown above or at such other place as Lender may designate in writing.

**VARIABLE INTEREST RATE.** The interest rate on this Note is subject to change from time to time based on changes in an independent index which is the Wall Street Journal Prime Rate (the "Index"). The Index is not necessarily the lowest rate charged by Lender on its loans. If the Index becomes unavailable during the term of this loan, Lender may designate a substitute index after notifying Borrower. Lender will tell Borrower the current index rate upon Borrower's request. The interest rate change will not occur more often than each month, on the first day of each month. Borrower understands that Lender may make loans based on other rates as well. The Index currently is 8.000% per annum. The interest rate or rates to be applied to the unpaid principal balance during this Note will be the rate or rates set forth herein in the "Payment" section. Notwithstanding any other provision of this Note, after the first payment stream, the interest rate for each subsequent payment stream will be effective as of the last payment date of the just-ending payment stream. NOTICE: Under no circumstances will the interest rate on this Note be less than 6.750% per annum or more than (except for any higher default rate shown below) the lesser of 18.000% per annum or the maximum rate allowed by applicable law. Whenever increases occur in the interest rate, Lender, at its option, may do one or more of the following: (A) increase Borrower's payments to ensure Borrower's loan will pay off by its original final maturity date, (B) increase Borrower's payments to cover accruing interest, (C) increase the number of Borrower's payments, and (D) continue Borrower's payments at the same amount and increase Borrower's final payment.

**PREPAYMENT PENALTY; MINIMUM INTEREST CHARGE.** Borrower agrees that all loan fees and other prepaid finance charges are earned fully as of the date of the loan and will not be subject to refund upon early payment (whether voluntary or as a result of default), except as otherwise required by law. In any event, even upon full prepayment of this Note, Borrower understands that Lender is entitled to a minimum interest charge of $25.00. Upon prepayment of this Note, Lender is entitled to the following prepayment penalty: The Borrowers shall be permitted to prepay the loan at any time without penalty, provided funds used for such prepayments are not obtained from a lending institution. Except for the aforementioned, prepayments will be subject to a penalty equal to 5.00% of the amount prepaid during the first year; 4.00% of the amount prepaid during the second year; 3.00% of the amount prepaid during the third year; 2.00% of the amount prepaid during the fourth year; and 1.00% of the amount paid during the fifth year. Other than Borrower's obligation to pay any minimum interest charge and prepayment penalty, Borrower may pay all or a portion of the amount owed earlier than it is due. Early payments will not, unless agreed to by Lender in writing, relieve Borrower of Borrower's obligation to continue to make payments under the payment schedule. Rather, early payments will reduce the principal balance due and may result in Borrower's making fewer payments. Borrower agrees not to send Lender payments marked "paid in full", "without recourse", or similar language. If Borrower sends such a payment, Lender may accept it without losing any of Lender's rights under this Note, and Borrower will remain obligated to pay any further amount owed to Lender. All written communications concerning disputed amounts, including any check or other payment instrument that indicates that the payment constitutes "payment in full" of the amount owed or that is tendered with other conditions or limitations or as full satisfaction of a disputed amount must be mailed or delivered to: Union National Community Bank, Credit Services Division, P.O. Box 627 Mount Joy, PA  17552-0627.

**LATE CHARGE.** If a payment is 16 days or more late, Borrower will be charged 10.000% of the regularly scheduled payment or $20.00, whichever is greater.

**INTEREST AFTER DEFAULT.** Upon default, including failure to pay upon final maturity, the interest rate on this Note shall be increased to 18.000% per annum ("Default Rate"). If judgment is entered in connection with this Note, interest will continue to accrue after the date of judgment at the Default Rate. However, in no event will the interest rate exceed the maximum interest rate limitations under applicable law.

**DEFAULT.** Each of the following shall constitute an event of default ("Event of Default") under this Note:

**Payment Default.** Borrower fails to make any payment when due under this Note.

**Other Defaults.** Borrower fails to comply with or to perform any other term, obligation, covenant or condition contained in this Note or in any of the related documents or to comply with or to perform any term, obligation, covenant or condition contained in any other agreement between Lender and Borrower.

**False Statements.** Any warranty, representation or statement made or furnished to Lender by Borrower or on Borrower's behalf under this Note or the related documents is false or misleading in any material respect, either now or at the time made or furnished or becomes false or misleading at any time thereafter.

**Death or Insolvency.** The death of Borrower or the dissolution or termination of Borrower's existence as a going business, the insolvency of Borrower, the appointment of a receiver for any part of Borrower's property, any assignment for the benefit of creditors, any type of creditor workout, or the commencement of any proceeding under any bankruptcy or insolvency laws by or against Borrower.

**Creditor or Forfeiture Proceedings.** Commencement of foreclosure or forfeiture proceedings, whether by judicial proceeding, self-help, repossession or any other method, by any creditor of Borrower or by any governmental agency against any collateral securing the loan. This includes a garnishment of any of Borrower's accounts, including deposit accounts, with Lender. However, this Event of Default shall not apply if there is a good faith dispute by Borrower as to the validity or reasonableness of the claim which is the basis of the creditor or forfeiture proceeding and if Borrower gives Lender written notice of the creditor or forfeiture proceeding and deposits with Lender monies or a surety bond for the creditor or forfeiture proceeding, in an amount determined by Lender, in its sole discretion, as being an adequate reserve or bond for the dispute.

**Events Affecting Guarantor.** Any of the preceding events occurs with respect to any guarantor, endorser, surety, or accommodation party of any of the indebtedness or any guarantor, endorser, surety, or accommodation party dies or becomes incompetent, or revokes or disputes the validity of, or liability under, any guaranty of the indebtedness evidenced by this Note. In the event of a death, Lender, at its option, may, but shall not be required to, permit the guarantor's estate to assume unconditionally the obligations arising under the guaranty in a manner satisfactory to Lender, and, in doing so, cure any Event of Default.

**Adverse Change.** A material adverse change occurs in Borrower's financial condition, or Lender believes the prospect of payment or performance of this Note is impaired.

**Cure Provisions.** If any default, other than a default in payment is curable and if Borrower has not been given a notice of a breach of the same provision of this Note within the preceding twelve (12) months, it may be cured if Borrower, after receiving written notice from

# PROMISSORY NOTE
## (Continued)

Page 2

Lender demanding cure of such default: (1) cures the default within sixteen (16) days; or (2) if the cure requires more than sixteen (16) days, immediately initiates steps which Lender deems in Lender's sole discretion to be sufficient to cure the default and thereafter continues and completes all reasonable and necessary steps sufficient to produce compliance as soon as reasonably practical.

**LENDER'S RIGHTS.** Upon default, Lender may, after giving such notices as required by applicable law, declare the entire unpaid principal balance under this Note and all accrued unpaid interest immediately due, and then Borrower will pay that amount.

**ATTORNEYS' FEES; EXPENSES.** Lender may hire or pay someone else to help collect this Note if Borrower does not pay. Borrower will pay Lender that amount. This includes, subject to any limits under applicable law, Lender's attorneys' fees and Lender's legal expenses, whether or not there is a lawsuit, including attorneys' fees, expenses for bankruptcy proceedings (including efforts to modify or vacate any automatic stay or injunction), and appeals. If not prohibited by applicable law, Borrower also will pay any court costs, in addition to all other sums provided by law.

**RIGHT OF SETOFF.** To the extent permitted by applicable law, Lender reserves a right of setoff in all Borrower's accounts with Lender (whether checking, savings, or some other account). This includes all accounts Borrower holds jointly with someone else and all accounts Borrower may open in the future. However, this does not include any IRA or Keogh accounts, or any trust accounts for which setoff would be prohibited by law. Borrower authorizes Lender, to the extent permitted by applicable law, to charge or setoff all sums owing on the indebtedness against any and all such accounts.

**COLLATERAL.** Borrower acknowledges this Note is secured by a first position Real Estate Collateral Mortgage dated June 1, 2006 and recorded against property located at 8281 Holbens Valley Road, New Tripoli, Weisenberg Township, Lehigh County, PA from Larry L. and Cathleen R. Wisser to Lender.

**PROPERTY INSURANCE.** Borrower understands that Borrower is required to obtain insurance for the collateral securing this Note. Further information concerning this requirement is set forth in the Mortgage and in the Agreement to Provide Insurance, all the terms and conditions of which are hereby incorporated and made a part of this Note.

**INCORPORATION OF OTHER DOCUMENTS.** All the terms, covenants and conditions contained in the Mortgage and in an any other agreement, including a construction loan agreement, or document securing or executed in connection with the indebtedness evidenced hereby (such other agreement or document being hereinafter collectively called "Collateral"), are incorporated herein by reference and are hereby made a part of this Note to the same extent and with the same force and effect as if they were fully set forth herein. If Maker fails to keep, observe and perform any of the terms, covenants and conditions contained in this Note, the Mortgage or in the Collateral in accordance with the terms and provisions thereof, Bank may, in its discretion, but without any obligation or duty to so do and without waiving any default, perform any of such terms, covenants and conditions, in part or in whole, and any money advanced or expended by Bank in or toward the fulfillment of such terms, covenants and conditions, shall be due on demand and become a part of and added to the indebtedness due under this Note and secured by the Mortgage and other Collateral with interest thereon at the same rate as the principal of this Note, from the date of the respective advance or expenditure.

**ADDITIONAL OBLIGATIONS.** Borrower covenants and agrees with Lender that while this Agreement is in effect, Borrower shall not, without the prior written consent of Lender: (1) Except for trade debt incurred in the normal course of business and indebtedness to Lender contemplated by this Agreement, create, incur or assume indebtedness for borrowed money, including capital leases, (2) sell, transfer, mortgage, assign, pledge, lease, grant a security interest in, or encumber any of Borrower's assets (except as allowed as Permitted Liens), or (3) sell with recourse any of Borrower's accounts, except to Lender, (4) incur any obligation as surety or guarantor other than in the ordinary course of business.

**SUCCESSOR INTERESTS.** The terms of this Note shall be binding upon Borrower, and upon Borrower's heirs, personal representatives, successors and assigns, and shall inure to the benefit of Lender and its successors and assigns.

**GENERAL PROVISIONS.** If any part of this Note cannot be enforced, this fact will not affect the rest of the Note. Lender may delay or forgo enforcing any of its rights or remedies under this Note without losing them. Each Borrower understands and agrees that, with or without notice to Borrower, Lender may with respect to any other Borrower (a) make one or more additional secured or unsecured loans or otherwise extend additional credit; (b) alter, compromise, renew, extend, accelerate, or otherwise change one or more times the time for payment or other terms of any indebtedness, including increases and decreases of the rate of interest on the indebtedness; (c) exchange, enforce, waive, subordinate, fail or decide not to perfect, and release any security, with or without the substitution of new collateral; (d) apply such security and direct the order or manner of sale thereof, including without limitation, any non-judicial sale permitted by the terms of the controlling security agreements, as Lender in its discretion may determine; (e) release, substitute, agree not to sue, or deal with any one or more of Borrower's sureties, endorsers, or other guarantors on any terms or in any manner Lender may choose; and (f) determine how, when and what application of payments and credits shall be made on any other indebtedness owing by such other Borrower. Borrower and any other person who signs, guarantees or endorses this Note, to the extent allowed by law, waive presentment, demand for payment, and notice of dishonor. Upon any change in the terms of this Note, and unless otherwise expressly stated in writing, no party who signs this Note, whether as maker, guarantor, accommodation maker or endorser, shall be released from liability. All such parties agree that Lender may renew or extend (repeatedly and for any length of time) this loan or release any party or guarantor or collateral; or impair, fail to realize upon or perfect Lender's security interest in the collateral; and take any other action deemed necessary by Lender without the consent of or notice to anyone. All such parties also agree that Lender may modify this loan without the consent of or notice to anyone other than the party with whom the modification is made. The obligations under this Note are joint and several. If any portion of this Note is for any reason determined to be unenforceable, it will not affect the enforceability of any other provisions of this Note.

**CONFESSION OF JUDGMENT.** BORROWER HEREBY IRREVOCABLY AUTHORIZES AND EMPOWERS ANY ATTORNEY OR THE PROTHONOTARY OR CLERK OF ANY COURT IN THE COMMONWEALTH OF PENNSYLVANIA, OR ELSEWHERE, TO APPEAR AT ANY TIME FOR BORROWER AFTER A DEFAULT UNDER THIS NOTE AND WITH OR WITHOUT COMPLAINT FILED, CONFESS OR ENTER JUDGMENT AGAINST BORROWER FOR THE ENTIRE PRINCIPAL BALANCE OF THIS NOTE AND ALL ACCRUED INTEREST, LATE CHARGES AND ANY AND ALL AMOUNTS EXPENDED OR ADVANCED BY LENDER RELATING TO ANY COLLATERAL SECURING THIS NOTE, TOGETHER WITH COSTS OF SUIT, AND AN ATTORNEY'S COMMISSION OF TEN PERCENT (10%) OF THE UNPAID PRINCIPAL BALANCE AND ACCRUED INTEREST FOR COLLECTION, BUT IN ANY EVENT NOT LESS THAN FIVE HUNDRED DOLLARS ($500) ON WHICH JUDGMENT OR JUDGMENTS ONE OR MORE EXECUTIONS MAY ISSUE IMMEDIATELY; AND FOR SO DOING, THIS NOTE OR A COPY OF THIS NOTE VERIFIED BY AFFIDAVIT SHALL BE SUFFICIENT WARRANT. THE AUTHORITY GRANTED IN THIS NOTE TO CONFESS JUDGMENT AGAINST BORROWER SHALL NOT BE EXHAUSTED BY ANY EXERCISE OF THAT AUTHORITY, BUT SHALL CONTINUE FROM TIME TO TIME AND AT ALL TIMES UNTIL PAYMENT IN FULL OF ALL AMOUNTS DUE UNDER THIS NOTE. BORROWER HEREBY WAIVES ANY RIGHT BORROWER MAY HAVE TO NOTICE OR TO A HEARING IN CONNECTION WITH ANY SUCH CONFESSION OF JUDGMENT AND STATES THAT EITHER A REPRESENTATIVE OF LENDER SPECIFICALLY CALLED THIS CONFESSION OF JUDGMENT PROVISION TO BORROWER'S ATTENTION OR BORROWER HAS BEEN REPRESENTED BY INDEPENDENT LEGAL COUNSEL.

PRIOR TO SIGNING THIS NOTE, EACH BORROWER READ AND UNDERSTOOD ALL THE PROVISIONS OF THIS NOTE, INCLUDING THE VARIABLE INTEREST RATE PROVISIONS. EACH BORROWER AGREES TO THE TERMS OF THIS NOTE.

BORROWER ACKNOWLEDGES RECEIPT OF A COMPLETED COPY OF THIS PROMISSORY NOTE.

THIS NOTE IS GIVEN UNDER SEAL AND IT IS INTENDED THAT THIS NOTE IS AND SHALL CONSTITUTE AND HAVE THE EFFECT OF A SEALED INSTRUMENT ACCORDING TO LAW.

BORROWER:

X _____ (Seal)    X _____ (Seal)
Larry L Wisser                        Cathleen R Wisser

# CHANGE IN TERMS AGREEMENT

| Principal | Loan Date | Maturity | | Call / Coll | | Officer | Initials |
|---|---|---|---|---|---|---|---|
| $432,575.58 | 06-01-2006 | 06-20-2026 | | 1500 / 01 | | 987 | |

References in the boxes above are for Lender's use only and do not limit the applicability of this document to any particular loan or item.
Any item above containing "****" has been omitted due to text length limitations.

**Borrower:**  Larry L Wisser
Cathleen R Wisser
8149 Bausch Road
New Tripoli, PA  18066

**Lender:**  Union National Community Bank
HACC Gold Cafe
1625 Old Philadelphia Pike
Lancaster, PA  17602

**Principal Amount: $432,575.58**

**Date of Agreement: July 30, 2009**

Maturity Date: June 20, 2026

**DESCRIPTION OF EXISTING INDEBTEDNESS.** An Agricultural Term Loan dated June 1, 2006 in the original amount of $465,000.00 with sixty (60) monthly principal and interest payments based on a fixed rate of 7.25% followed by one hundred eighty (180) monthly principal and interest payments based on a variable rate of Wall Street Journal Prime plus 1.00% and a floor of 6.75% with a scheduled maturity date of June 20, 2026.

**DESCRIPTION OF COLLATERAL.** The loan shall continue to be secured by a 1st position mortgage dated June 1, 2006 and recorded June 5, 2006, DOC ID #7351866 against property located 8281 Holbens Valley Road, New Tripoli, Weisenberg Township, Lehigh County, PA from Larry L and Cathleen R Wisser to Lender .

**DESCRIPTION OF CHANGE IN TERMS.** Beginning with the August 20, 2009 payment will be the addition of a six (6) month interest only period. The current maturity date shall remain the same as will all other aspects of the loan .

**PAYMENT.** Borrower will pay this loan in accordance with the following payment schedule, which calculates interest on the unpaid principal balances as described in the "INTEREST CALCULATION METHOD" paragraph using the interest rates described in this paragraph:  6 monthly consecutive interest payments, beginning August 20, 2009, with interest calculated on the unpaid principal balances using an interest rate of 7.250% per annum based on a year of 360 days; 17 monthly consecutive principal and interest payments in the initial amount of $3,708.32 each, beginning February 20, 2010, with interest calculated on the unpaid principal balances using an interest rate of 7.250% per annum based on a year of 360 days; 179 monthly consecutive principal and interest payments in the initial amount of $3,682.75 each, beginning July 20, 2011, with interest calculated on the unpaid principal balances using an interest rate based on the Wall Street Journal Prime Rate (currently 3.250%), plus a margin of 1.000 percentage points, adjusted if necessary for the minimum and maximum rate limitations for this loan, resulting in an initial interest rate of 6.750% per annum based on a year of 360 days; and one principal and interest payment of $3,683.57 on June 20, 2026, with interest calculated on the unpaid principal balances using an interest rate based on the Wall Street Journal Prime Rate (currently 3.250%), plus a margin of 1.000 percentage points, adjusted if necessary for the minimum and maximum rate limitations for this loan, resulting in an initial interest rate of 6.750% per annum based on a year of 360 days.  This estimated final payment is based on the assumption that all payments will be made exactly as scheduled and that the index does not change; the actual final payment will be for all principal and accrued interest not yet paid, together with any other unpaid amounts on this loan.

**VARIABLE INTEREST RATE.** The interest rate on this loan is subject to change from time to time based on changes in an independent index which is the Wall Street Journal Prime Rate (the "Index").  The Index is not necessarily the lowest rate charged by Lender on its loans.  If the Index becomes unavailable during the term of this loan, Lender may designate a substitute index after notifying Borrower.  Lender will tell Borrower the current index rate upon Borrower's request.  The interest rate change will not occur more often than each month.  Borrower understands that Lender may make loans based on other rates as well.  The Index currently is 3.250% per annum.  The interest rate or rates to be applied to the unpaid principal balance during this loan will be the rate or rates set forth herein in the "Payment" section.  Notwithstanding any other provision of this Agreement, after the first payment stream, the interest rate for each subsequent payment stream will be effective as of the last payment date of the just-ending payment stream.  NOTICE:  Under no circumstances will the interest rate on this loan be less than 6.750% per annum or more than (except for any higher default rate shown below) the lesser of 18.000% per annum or the maximum rate allowed by applicable law.  Wherever increases occur in the interest rate, Lender, at its option, may do one or more of the following:  (A) increase Borrower's payments to ensure Borrower's loan will pay off by its original final maturity date,  (B)  increase Borrower's payments to cover accruing interest,  (C)  increase the number of Borrower's payments, and  (D)  continue Borrower's payments at the same amount and increase Borrower's final payment.

**INTEREST CALCULATION METHOD.** Interest on this loan is computed on a 365/360 basis; that is, by applying the ratio of the interest rate over a year of 360 days, multiplied by the outstanding principal balance, multiplied by the actual number of days the principal balance is outstanding. All interest payable under this loan is computed using this method.

**CONTINUING VALIDITY.** Except as expressly changed by this Agreement, the terms of the original obligation or obligations, including all agreements evidenced or securing the obligation(s), remain unchanged and in full force and effect.  Consent by Lender to this Agreement does not waive Lender's right to strict performance of the obligation(s) as changed, nor obligates Lender to make any future change in terms.  Nothing in this Agreement will constitute a satisfaction of the obligation(s).  It is the intention of Lender to retain as liable parties all makers and endorsers of the original obligation(s), including accommodation parties, unless a party is expressly released by Lender in writing.  Any maker or endorser, including accommodation makers, will not be released by virtue of this Agreement.  If any person who signed the original obligation does not sign this Agreement below, then all persons signing below acknowledge that this Agreement is given conditionally, based on the representation to Lender that the non-signing party consents to the changes and provisions of this Agreement or otherwise will not be released by it.  This waiver applies not only to any initial extension, modification or release, but also to all such subsequent actions.

THIS AGREEMENT IS GIVEN UNDER SEAL AND IT IS INTENDED THAT THIS AGREEMENT IS AND SHALL CONSTITUTE AND HAVE THE EFFECT OF A SEALED INSTRUMENT ACCORDING TO LAW.

PRIOR TO SIGNING THIS AGREEMENT, EACH BORROWER READ AND UNDERSTOOD ALL THE PROVISIONS OF THIS AGREEMENT, INCLUDING THE VARIABLE INTEREST RATE PROVISIONS. EACH BORROWER AGREES TO THE TERMS OF THE AGREEMENT.

**BORROWER:**

X _____ (Seal)
Larry L Wisser

X _____ (Seal)
Cathleen R Wisser

LASER PRO Lending, Ver. 5.46.00.004  Copr. Harland Financial Solutions, Inc. 1997, 2009.  All Rights Reserved.  - PA  C:\CFI\LPL\G20C.FC  TR-15071  PR-52

# CHANGE IN TERMS AGREEMENT

| Principal | Loan Date | Maturity | | Call / Coll | | Officer | Initials |
|---|---|---|---|---|---|---|---|
| $424,548.96 | 06-01-2006 | 06-20-2026 | | 1500 / 01 | | 987 | |

References in the boxes above are for Lender's use only and do not limit the applicability of this document to any particular loan or item.
Any item above containing "****" has been omitted due to text length limitations.

**Borrower:** Larry L Wisser
Cathleen R Wisser
8149 Bausch Road
New Tripoli, PA 18066-3614

**Lender:** Union National Community Bank
HACC Gold Cafe
1625 Old Philadelphia Pike
Lancaster, PA 17602

Principal Amount: **$424,548.96**
Date of Agreement: **August 5, 2010**
Maturity Date: June 20, 2026

**DESCRIPTION OF EXISTING INDEBTEDNESS.** An Agricultural Term Loan dated June 1, 2006 in the original amount of $465,000.00 with sixty (60) monthly principal and interest payments based on a fixed rate of 7.25% followed by one hundred eighty (180) monthly principal and interest payments based on a variable rate of Wall Street Journal Prime plus 1.00% and a floor of 6.75% with a scheduled maturity date of June 20, 2026. A six (6) month interest only period was added with a Change in Terms Agreement dated July 30, 2009.

**DESCRIPTION OF COLLATERAL.** The loan shall continue to be secured by a 1st position mortgage dated June 1, 2006 and recorded July 5, 2006, DOC ID #7351866 against property located 8281 Holbens Valley Road, New Tripoli, Weisenberg Township, Lehigh County, PA from Larry L and Cathleen R Wisser to Lender.

**DESCRIPTION OF CHANGE IN TERMS.** There will be three (3) months interest only payments followed by thirty three (33) monthly principal and interest payments at a fixed interest rate of 7.00% followed by one hundred fifty five (155) principal and interest payments at a variable interest rate of Wall Street Journal Prime Rate plus 1.50% with a floor of 7.00%.

**PAYMENT.** Borrower will pay this loan in accordance with the following payment schedule, which calculates interest on the unpaid principal balances as described in the "INTEREST CALCULATION METHOD" paragraph using the interest rates described in this paragraph: 3 monthly consecutive interest payments, beginning August 20, 2010, with interest calculated on the unpaid principal balances using an interest rate of 7.000% per annum based on a year of 360 days; 33 monthly consecutive principal and interest payments in the initial amount of $3,708.32 each, beginning November 20, 2010, with interest calculated on the unpaid principal balances using an interest rate of 7.000% per annum based on a year of 360 days; 154 monthly consecutive principal and interest payments in the initial amount of $3,763.57 each, beginning August 20, 2013, with interest calculated on the unpaid principal balances using an interest rate based on the Wall Street Journal Prime Rate (currently 3.250%), plus a margin of 1.500 percentage points, adjusted if necessary for the minimum and maximum rate limitations for this loan, resulting in an initial interest rate of 7.000% per annum based on a year of 360 days; and one principal and interest payment of $3,762.61 on June 20, 2026, with interest calculated on the unpaid principal balances using an interest rate based on the Wall Street Journal Prime Rate (currently 3.250%), plus a margin of 1.500 percentage points, adjusted if necessary for the minimum and maximum rate limitations for this loan, resulting in an initial interest rate of 7.000% per annum based on a year of 360 days. This estimated final payment is based on the assumption that all payments will be made exactly as scheduled and that the index does not change; the actual final payment will be for all principal and accrued interest not yet paid, together with any other unpaid amounts on this loan.

**VARIABLE INTEREST RATE.** The interest rate on this loan is subject to change from time to time based on changes in an independent index which is the Wall Street Journal Prime Rate (the "Index"). The index is not necessarily the lowest rate charged by Lender on its loans. If the Index becomes unavailable during the term of this loan, Lender may designate a substitute index after notifying Borrower. Lender will tell Borrower the current index rate upon Borrower's request. The interest rate change will not occur more often than each month. Borrower understands that Lender may make loans based on other rates as well. The index currently is 3.250% per annum. The interest rate or rates to be applied to the unpaid principal balance during this loan will be the rate or rates set forth herein in the "Payment" section. Notwithstanding any other provision of this Agreement, after the first payment stream, the interest rate for each subsequent payment stream will be effective as of the last payment date of the just-ending payment stream. NOTICE: Under no circumstances will the interest rate on this loan be less than 7.000% per annum or more than (except for any higher default rate shown below) the lesser of 18.000% per annum or the maximum rate allowed by applicable law. Whenever increases occur in the interest rate, Lender, at its option, may do one or more of the following: (A) increase Borrower's payments to ensure Borrower's loan will pay off by its original final maturity date, (B) increase Borrower's payments to cover accruing interest, (C) increase the number of Borrower's payments, and (D) continue Borrower's payments at the same amount and increase Borrower's final payment.

**INTEREST CALCULATION METHOD.** Interest on this loan is computed on a 365/360 basis; that is, by applying the ratio of the interest rate over a year of 360 days, multiplied by the outstanding principal balance, multiplied by the actual number of days the principal balance is outstanding. All interest payable under this loan is computed using this method.

**CONTINUING VALIDITY.** Except as expressly changed by this Agreement, the terms of the original obligation or obligations, including all agreements evidenced or securing the obligation(s), remain unchanged and in full force and effect. Consent by Lender to this Agreement does not waive Lender's right to strict performance of the obligation(s) as changed, nor obligate Lender to make any future change in terms. Nothing in this Agreement will constitute a satisfaction of the obligation(s). It is the intention of Lender to retain as liable parties all makers and endorsers of the original obligation(s), including accommodation parties, unless a party is expressly released by Lender in writing. Any maker or endorser, including accommodation makers, will not be released by virtue of this Agreement. If any person who signed the original obligation does not sign this Agreement below, then all persons signing below acknowledge that this Agreement is given conditionally, based on the representation to Lender that the non-signing party consents to the changes and provisions of this Agreement or otherwise will not be released by it. This waiver applies not only to any initial extension, modification or release, but also to all such subsequent actions.

THIS AGREEMENT IS GIVEN UNDER SEAL AND IT IS INTENDED THAT THIS AGREEMENT IS AND SHALL CONSTITUTE AND HAVE THE EFFECT OF A SEALED INSTRUMENT ACCORDING TO LAW.

PRIOR TO SIGNING THIS AGREEMENT, EACH BORROWER READ AND UNDERSTOOD ALL THE PROVISIONS OF THIS AGREEMENT, INCLUDING THE VARIABLE INTEREST RATE PROVISIONS. EACH BORROWER AGREES TO THE TERMS OF THE AGREEMENT.

BORROWER:

X _Larry L Wisser_ (Seal)

X _Cathleen R Wisser_ (Seal)
Cathleen R Wisser

# CHANGE IN TERMS AGREEMENT

| Principal | Loan Date | Maturity | | Call / Coll | | Officer | Initials |
|---|---|---|---|---|---|---|---|
| $350,363.85 | 06-01-2006 | 06-30-2026 | | 1500 / 01 | | 987 | |

References in the boxes above are for Lender's use only and do not limit the applicability of this document to any particular loan or item.
Any item above containing "****" has been omitted due to text length limitations.

**Borrower:**  Larry L Wisser
Cathleen R Wisser
8149 Bausch Road
New Tripoli, PA 18066-3614

**Lender:**  Union Community Bank
HACC Office
1625 Old Philadelphia Pike
Lancaster, PA 17602

---

**Principal Amount: $350,363.85**

**Date of Agreement: April 2, 2015**

Maturity Date: June 30, 2026

**DESCRIPTION OF EXISTING INDEBTEDNESS.** An agricultural term loan in the original amount of $465,000.00, as evidenced by a promissory note dated June 1, 2006 from Borrower to Union National Community Bank, now by merger Union Community Bank. The interest rate and repayment terms were modified by Change in Terms Agreements dated July 30, 2009 and August 5, 2010, resulting in a current rate of 7.00%.

**DESCRIPTION OF COLLATERAL.** The loan shall continue to be secured by a mortgage dated June 1, 2006 and recorded July 5, 2006, in the Office of the Recorder of Deeds, Lehigh County, PA as instrument #7351866, against property located at 8281 Holbens Valley Road, New Tripoli, Weisenberg Township, PA from Larry L. Wisser and Cathleen R. Wisser to Union National Community Bank, now by merger Union Community Bank.

**DESCRIPTION OF CHANGE IN TERMS.** Beginning with the payment due April 30, 2015, there shall be six (6) monthly interest only payments, followed by one hundred twenty-eight (128) monthly principal and interest payments, and one (1) final balloon payment of all remaining principal and unpaid interest due on or before the maturity date of June 30, 2026.

**PAYMENT.** Borrower will pay this loan in accordance with the following payment schedule, which calculates interest on the unpaid principal balances as described in the "INTEREST CALCULATION METHOD" paragraph using the interest rates described in this paragraph: one principal payment of $1,663.86 on March 30, 2015, during which interest continues to accrue on the unpaid principal balances using an interest rate based on the Wall Street Journal Prime Rate (currently 3.250%), plus a margin of 1.500 percentage points, adjusted if necessary for the minimum and maximum rate limitations for this loan, resulting in an initial interest rate of 7.000% per annum based on a year of 360 days; one interest payment on March 30, 2015, with interest calculated on the unpaid principal balances using an interest rate based on the Wall Street Journal Prime Rate (currently 3.250%), plus a margin of 1.500 percentage points, adjusted if necessary for the minimum and maximum rate limitations for this loan, resulting in an initial interest rate of 7.000% per annum based on a year of 360 days; 6 monthly consecutive interest payments, beginning April 30, 2015, with interest calculated on the unpaid principal balances using an interest rate based on the Wall Street Journal Prime Rate (currently 3.250%), plus a margin of 1.500 percentage points, adjusted if necessary for the minimum and maximum rate limitations for this loan, resulting in an initial interest rate of 7.000% per annum based on a year of 360 days; 128 monthly consecutive principal and interest payments in the initial amount of $3,708.32 each, beginning October 30, 2015, with interest calculated on the unpaid principal balances using an interest rate based on the Wall Street Journal Prime Rate (currently 3.250%), plus a margin of 1.500 percentage points, adjusted if necessary for the minimum and maximum rate limitations for this loan, resulting in an initial interest rate of 7.000% per annum based on a year of 360 days; and one principal and interest payment of $35,354.66 on June 30, 2026, with interest calculated on the unpaid principal balances using an interest rate based on the Wall Street Journal Prime Rate (currently 3.250%), plus a margin of 1.500 percentage points, adjusted if necessary for the minimum and maximum rate limitations for this loan, resulting in an initial interest rate of 7.000% per annum based on a year of 360 days. This estimated final payment is based on the assumption that all payments will be made exactly as scheduled and that the index does not change; the actual final payment will be for all principal and accrued interest not yet paid, together with any other unpaid amounts on this loan. Notwithstanding the foregoing, the rate of interest accrual described for the principal only payment stream applies only to the extent that no other interest rate for any other payment stream applies.

**VARIABLE INTEREST RATE.** The interest rate on this loan is subject to change from time to time based on changes in an independent index which is the Wall Street Journal Prime Rate (the "Index"). The Index is not necessarily the lowest rate charged by Lender on its loans. If the Index becomes unavailable during the term of this loan, Lender may designate a substitute index after notifying Borrower. Lender will tell Borrower the current index rate upon Borrower's request. The interest rate change will not occur more often than each month. Borrower understands that Lender may make loans based on other rates as well. The index currently is 3.250% per annum. The interest rate or rates to be applied to the unpaid principal balance during this loan will be the rate or rates set forth herein in the "Payment" section. Notwithstanding any other provision of this Agreement, after the first payment stream, the interest rate for each subsequent payment stream will be effective as of the due date of the last payment in the just-ending payment stream. NOTICE: Under no circumstances will the interest rate on this loan be less than 7.000% per annum or more than (except for any higher default rate shown below) the lesser of 18.000% per annum or the maximum rate allowed by applicable law. Whenever increases occur in the interest rate, Lender, at its option, may do one or more of the following: (A) increase Borrower's payments to ensure Borrower's loan will pay off by its original final maturity date, (B) increase Borrower's payments to cover accruing interest, (C) increase the number of Borrower's payments, and (D) continue Borrower's payments at the same amount and increase Borrower's final payment.

**INTEREST CALCULATION METHOD.** Interest on this loan is computed on a 365/360 basis; that is, by applying the ratio of the interest rate over a year of 360 days, multiplied by the outstanding principal balance, multiplied by the actual number of days the principal balance is outstanding. All interest payable under this loan is computed using this method.

**CONTINUING VALIDITY.** Except as expressly changed by this Agreement, the terms of the original obligation or obligations, including all agreements evidenced by securing the obligation(s), remain unchanged and in full force and effect. Consent by Lender to this Agreement does not waive Lender's right to strict performance of the obligation(s) as changed, nor obligate Lender to make any future change in terms. Nothing in this Agreement will constitute a satisfaction of the obligation(s). It is the intention of Lender to retain as liable parties all makers and endorsers of the original obligation(s), including accommodation parties, unless a party is expressly released by Lender in writing. Any maker or endorser, including accommodation makers, will not be released by virtue of this Agreement. If any person who signed the original obligation does not sign this Agreement below, then all persons signing below acknowledge that this Agreement is given conditionally, based on the representation to Lender that the non-signing party consents to the changes and provisions of this Agreement or otherwise will not be released by it. This waiver applies not only to any initial extension, modification or release, but also to all such subsequent actions.

# CHANGE IN TERMS AGREEMENT
## (Continued)

Page 2

THIS AGREEMENT IS GIVEN UNDER SEAL AND IT IS INTENDED THAT THIS AGREEMENT IS AND SHALL CONSTITUTE AND HAVE THE EFFECT OF A SEALED INSTRUMENT ACCORDING TO LAW.

PRIOR TO SIGNING THIS AGREEMENT, EACH BORROWER READ AND UNDERSTOOD ALL THE PROVISIONS OF THIS AGREEMENT, INCLUDING THE VARIABLE INTEREST RATE PROVISIONS. EACH BORROWER AGREES TO THE TERMS OF THE AGREEMENT.

BORROWER:

X _____ (Seal)      X _____ (Seal)
Larry L Wisser                               Cathleen R Wisser

LENDER:

UNION COMMUNITY BANK

X _____
Authorized Signer

LaserPro, Ver. 14.5.10.004  Copr. D+H USA Corporation 1997, 2015.  All Rights Reserved.  - PA  C:\CFI\LPL\D10C.FC  TR-20732  PR-59

# EXHIBIT B

JMM

DST
LIS

Parcel Identification
  Number:
  5428715993141

RECORDATION
  REQUESTED BY:
  Union National Community
  Bank
  HACC Gold Cafe
  1625 Old Philadelphia Pike
  Lancaster, PA 17602

WHEN RECORDED MAIL
  TO:
  Union National Community
  Bank
  570 Lausch Lane
  Lancaster, PA 17601

MAIL
T.A. OF LANCASTER
329 A MAIN ST.
LANDISVILLE, PA 17538

**FOR RECORDER'S USE ONLY**

---

## MORTGAGE

**Amount Secured Hereby:**    $465,000.00

THIS MORTGAGE dated June 1, 2006, is made and executed between Larry L Wisser and Cathleen R Wisser, whose address is 8149 Bausch Road, New Tripoli, PA 18066 (referred to below as "Grantor") and Union National Community Bank, whose address is 1625 Old Philadelphia Pike, Lancaster, PA 17602 (referred to below as "Lender").

GRANT OF MORTGAGE. For valuable consideration, Grantor grants, bargains, sells, conveys, assigns, transfers, releases, confirms and mortgages to Lender all of Grantor's right, title, and interest in and to the following described real property, together with all existing or subsequently erected or affixed buildings, improvements and fixtures; all streets, lanes, alleys, passages, and ways; all easements, rights of way, all liberties, privileges, tenements, hereditaments, and appurtenances thereunto belonging or anywise made appurtenant hereafter, and the reversions and remainders with respect thereto; all water, water rights, watercourses and ditch rights (including stock in utilities with ditch or irrigation rights); and all other rights, royalties, and profits relating to the real property, including without limitation all minerals, oil, gas, geothermal and similar matters, (the "Real Property") located in Lehigh County, Commonwealth of Pennsylvania:

See Exhibit "A" , which is attached to this Mortgage and made a part of this Mortgage as if fully set forth herein.

The Real Property or its address is commonly known as 8281 Holbens Valley Road, New Tripoli, PA 18066. The Real Property parcel identification number is 5428715993141.

Grantor presently assigns to Lender all of Grantor's right, title, and interest in and to all present and future leases of the Property and all Rents from the Property. In addition, Grantor grants to Lender a Uniform Commercial Code security interest in the Personal Property and Rents.

THIS MORTGAGE, INCLUDING THE ASSIGNMENT OF RENTS AND THE SECURITY INTEREST IN THE RENTS AND PERSONAL PROPERTY, IS GIVEN TO SECURE (A) PAYMENT OF THE INDEBTEDNESS AND (B) PERFORMANCE OF ANY AND ALL OBLIGATIONS UNDER THE NOTE IN THE ORIGINAL PRINCIPAL AMOUNT OF $465,000.00, THE RELATED DOCUMENTS, AND THIS MORTGAGE. THIS MORTGAGE IS GIVEN AND ACCEPTED ON THE FOLLOWING TERMS:

PAYMENT AND PERFORMANCE. Except as otherwise provided in this Mortgage, Grantor shall pay to Lender all amounts secured by this Mortgage as they become due and shall strictly perform all of Grantor's obligations under this Mortgage.

POSSESSION AND MAINTENANCE OF THE PROPERTY. Grantor agrees that Grantor's possession and use of the Property shall be governed by the following provisions:

Possession and Use. Until the occurrence of an Event of Default, Grantor may (1) remain in possession and control of the Property; (2) use, operate or manage the Property; and (3) collect the Rents from the Property.

---

This Document Recorded
07/05/2006
12:57PM
Doc Code: MTG          Lehigh County, PA Recorder of Deeds Office

Doc Id: 7351866
Receipt #: 254423
Rec Fee: 57.00



7351866
Page: 1 of 12
07/05/2006 12:57PM

# EXHIBIT A
# LEGAL DESCRIPTION

ALL THOSE TWO CERTAIN tracts of land situate in the Township of Weisenberg, County of Lehigh and Commonwealth of Pennsylvania, and bounded and described as follows, to wit:-

TRACT No. 1
ALL THAT CERTAIN messuage, and tract of land, situate in the said Township of Weisenberg, County of Lehigh and State of Pennsylvania, bounded and described as follows, to wit:

BEGINNING at a post for a corner, thence by land of Stephen Balliet, South 44 degrees West 37 3/4 perches to a stone; thence by the same South 66 degrees East 56 perches to a stone, South 16 degrees West 25 perches to a walnut tree, North 69 degrees West 11 1/4 perches to a walnut tree, South 31 degrees West 24 perches to a stone, North 69 degrees West 10 1/4 perches to a stone, South 20 degrees West 18 3/4 perches to a post, North 56 1/2 degrees West 20 1/4 perches to a post, North 29 degrees East 17 perches to a post, North 67 1/2 degrees West 18 perches to a post, and South 7 degrees West 43 perches to a post; thence partly by land of Alvin Werley and partly by land of Polly Schleicher, North 50 degrees West 108 1/4 perches to a post; thence by land of Daniel S. Fenstermaker, North 33 degrees East 20 perches to a post; thence by land of Jonas W. Bachman, South 54 1/4 degrees East 27 1/2 perches to a post, North 35 degrees East 20 perches to a post North 57 degrees West 13 perches to a post, and by the same North 24 degrees West 18 perches to a post; thence by land of Daniel Snyder, North 33 degrees East 15 3/4 perches to a stone, North 86 1/2 degrees East 32 perches to a stone, and North 3 1/2 degrees West 18 1/2 perches to a stone; thence by lands of Peter Bachman, East 36 perches to a stone, and thence by land of John Ross, South 50 degree East 41 3/4 perches to the place of beginning.

CONTAINING 73 acres and 130 perches, strict measure.  Less, however, 2 acres conveyed by John D. Bausch.

TRACT #2
ALL THAT CERTAIN tract or piece of land situate in the Township of Weisenberg, in the County of Lehigh and State of Pennsylvania, bounded and described as follows, to wit:

BEGINNING at a stone corner, thence South along line of land of Stephen Bachman, South 74 perches to a stone; thence along land of John D. Bausch, North 88 degrees East 42.16 perches to a stone; thence along land of John B. Werley, North 16 1/2 degrees East 19.04 perches to a stone; thence along said land North 6 1/4 degrees West 7.48 perches to a stone; thence North 411.08 perches to a stone; thence North along said land North 82 1/2 degrees West 47.32 perches to the place of beginning.

CONTAINING 20 acres and 62.9 perches.

TRACT #3
ALL THAT CERTAIN, tract, lot or piece of land, situate in the Township of
Weisenburg, County of Lehigh and State of Pennsylvania, bounded and described as
follows, to wit.

BEGINNING at a post; thence by land late of Benedict Weiss, now partly by land of
William S. Balliet, and partly by land of John D. Baush, North 53 1/2 degrees West
70 1/2 perches to a post; thence by land late of George Custard now Stephen
Bachman, North 87 degrees East 13 1/2 perches to a stone; thence by the same North
4 degrees 3 perches to a stone; thence by land of John B. Werley, North 84 degrees
East 42 perches to a post; thence partly by land of the same and partly by land of
William S. Balliet, South 2 degrees East 49 perches to the place of beginning.

CONTAINING 8 Acres and allowance.

TRACT # 4
ALL THAT CERTAIN tract or piece of meadow land, situate in the Township of
Weisenburg, County of Lehigh and State of Pennsylvania, bounded and described as
follows, to wit:

BEGINNING at a stone; thence by land of Jacob Ettinger, South 33 degrees West 28
1/4 perches to a corner; thence by land of David Bausch, South 54 1/4 degrees East 27
1/2 perches to a stone; thence North 35 degrees East 20 perches to a stone; thence
North 24 degrees West 18 perches to the place of beginning.

CONTAINING 3 acres and 120 perches, strict measure.

BEING THE SAME premises which Herman L. Wisser, widower, by deed dated
2/25/1991 and recorded 2/25/1991 in the Recorder of Deeds Office in and for Lehigh
County, Pennsylvania in Book 1465 Page 1087, granted and conveyed unto Larry L.
Wisser and Cathleen R. Wisser, husband and wife, as tenants by the entirety.

Pin #5428715993141

7351866
Page: 3 of 12
07/05/2006 12:57PM

# MORTGAGE
## (Continued)

**Duty to Maintain.** Grantor shall maintain the Property in tenantable condition and promptly perform all repairs, replacements, and maintenance necessary to preserve its value.

**Compliance With Environmental Laws.** Grantor represents and warrants to Lender that: (1) During the period of Grantor's ownership of the Property, there has been no use, generation, manufacture, storage, treatment, disposal, release or threatened release of any Hazardous Substance by any person on, under, about or from the Property; (2) Grantor has no knowledge of, or reason to believe that there has been, except as previously disclosed to and acknowledged by Lender in writing, (a) any breach or violation of any Environmental Laws, (b) any use, generation, manufacture, storage, treatment, disposal, release or threatened release of any Hazardous Substance on, under, about or from the Property by any prior owners or occupants of the Property, or (c) any actual or threatened litigation or claims of any kind by any person relating to such matters; and (3) Except as previously disclosed to and acknowledged by Lender in writing, (a) neither Grantor nor any tenant, contractor, agent or other authorized user of the Property shall use, generate, manufacture, store, treat, dispose of or release any Hazardous Substance on, under, about or from the Property; and (b) any such activity shall be conducted in compliance with all applicable federal, state, and local laws, regulations and ordinances, including without limitation all Environmental Laws. Grantor authorizes Lender and its agents to enter upon the Property to make such inspections and tests, at Grantor's expense, as Lender may deem appropriate to determine compliance of the Property with this section of the Mortgage. Any inspections or tests made by Lender shall be for Lender's purposes only and shall not be construed to create any responsibility or liability on the part of Lender to Grantor or to any other person. The representations and warranties contained herein are based on Grantor's due diligence in investigating the Property for Hazardous Substances. Grantor hereby (1) releases and waives any future claims against Lender for indemnity or contribution in the event Grantor becomes liable for cleanup or other costs under any such laws; and (2) agrees to indemnify and hold harmless Lender against any and all claims, losses, liabilities, damages, penalties, and expenses which Lender may directly or indirectly sustain or suffer resulting from a breach of this section of the Mortgage or as a consequence of any use, generation, manufacture, storage, disposal, release or threatened release occurring prior to Grantor's ownership or interest in the Property, whether or not the same was or should have been known to Grantor. The provisions of this section of the Mortgage, including the obligation to indemnify, shall survive the payment of the Indebtedness and the satisfaction and reconveyance of the lien of this Mortgage and shall not be affected by Lender's acquisition of any interest in the Property, whether by foreclosure or otherwise.

**Nuisance, Waste.** Grantor shall not cause, conduct or permit any nuisance nor commit, permit, or suffer any stripping of or waste on or to the Property or any portion of the Property. Without limiting the generality of the foregoing, Grantor will not remove, or grant to any other party the right to remove, any timber, minerals (including oil and gas), coal, clay, scoria, soil, gravel or rock products without Lender's prior written consent.

**Removal of Improvements.** Grantor shall not demolish or remove any Improvements from the Real Property without Lender's prior written consent. As a condition to the removal of any Improvements, Lender may require Grantor to make arrangements satisfactory to Lender to replace such Improvements with Improvements of at least equal value.

**Lender's Right to Enter.** Lender and Lender's agents and representatives may enter upon the Real Property at all reasonable times to attend to Lender's interests and to inspect the Real Property for purposes of Grantor's compliance with the terms and conditions of this Mortgage.

**Compliance with Governmental Requirements.** Grantor shall promptly comply with all laws, ordinances, and regulations, now or hereafter in effect, of all governmental authorities applicable to the use or occupancy of the Property, including without limitation, the Americans With Disabilities Act. Grantor may contest in good faith any such law, ordinance, or regulation and withhold compliance during any proceeding, including appropriate appeals, so long as Grantor has notified Lender in writing prior to doing so and so long as, in Lender's sole opinion, Lender's interests in the Property are not jeopardized. Lender may require Grantor to post adequate security or a surety bond, reasonably satisfactory to Lender, to protect Lender's interest.

**Duty to Protect.** Grantor agrees neither to abandon or leave unattended the Property. Grantor shall do all other acts, in addition to those acts set forth above in this section, which from the character and use of the Property are reasonably necessary to protect and preserve the Property.

**TAXES AND LIENS.** The following provisions relating to the taxes and liens on the Property are part of this Mortgage:

**Payment.** Grantor shall pay when due (and in all events prior to delinquency) all taxes, payroll taxes, special taxes, assessments, water charges and sewer service charges levied against or on account of the Property, and shall pay when due all claims for work done on or for services rendered or material furnished to the Property. Grantor shall maintain the Property free of any liens having priority over or equal to the interest of Lender under this Mortgage, except for those liens specifically agreed to in writing by Lender, and except for the lien of taxes and assessments not due as further specified in the Right to Contest paragraph.

**Right to Contest.** Grantor may withhold payment of any tax, assessment, or claim in connection with a good faith

# MORTGAGE
## (Continued)

dispute over the obligation to pay, so long as Lender's interest in the Property is not jeopardized. If a lien arises or is filed as a result of nonpayment, Grantor shall within fifteen (15) days after the lien arises or, if a lien is filed, within fifteen (15) days after Grantor has notice of the filing, secure the discharge of the lien, or if requested by Lender, deposit with Lender cash or a sufficient corporate surety bond or other security satisfactory to Lender in an amount sufficient to discharge the lien plus any costs and attorneys' fees, or other charges that could accrue as a result of a foreclosure or sale under the lien. In any contest, Grantor shall defend itself and Lender and shall satisfy any adverse judgment before enforcement against the Property. Grantor shall name Lender as an additional obligee under any surety bond furnished in the contest proceedings.

**Evidence of Payment.** Grantor shall upon demand furnish to Lender satisfactory evidence of payment of the taxes or assessments and shall authorize the appropriate governmental official to deliver to Lender at any time a written statement of the taxes and assessments against the Property.

**Notice of Construction.** Grantor shall notify Lender at least fifteen (15) days before any work is commenced, any services are furnished, or any materials are supplied to the Property, if any mechanic's lien, materialmen's lien, or other lien could be asserted on account of the work, services, or materials. Grantor will upon request of Lender furnish to Lender advance assurances satisfactory to Lender that Grantor can and will pay the cost of such improvements.

**PROPERTY DAMAGE INSURANCE.** The following provisions relating to insuring the Property are a part of this Mortgage:

**Maintenance of Insurance.** Grantor shall procure and maintain policies of fire insurance with standard extended coverage endorsements on a replacement basis for the full insurable value covering all Improvements on the Real Property in an amount sufficient to avoid application of any coinsurance clause, and with a standard mortgagee clause in favor of Lender. Grantor shall also procure and maintain comprehensive general liability insurance in such coverage amounts as Lender may request with Lender being named as additional insureds in such liability insurance policies. Additionally, Grantor shall maintain such other insurance, including but not limited to hazard, business interruption and boiler insurance as Lender may require. Policies shall be written by such insurance companies and in such form as may be reasonably acceptable to Lender. Grantor shall deliver to Lender certificates of coverage from each insurer containing a stipulation that coverage will not be cancelled or diminished without a minimum of ten (10) days' prior written notice to Lender and not containing any disclaimer of the insurer's liability for failure to give such notice. Each insurance policy also shall include an endorsement providing that coverage in favor of Lender will not be impaired in any way by any act, omission or default of Grantor or any other person. Should the Real Property be located in an area designated by the Director of the Federal Emergency Management Agency as a special flood hazard area, Grantor agrees to obtain and maintain Federal Flood Insurance, if available, within 45 days after notice is given by Lender that the Property is located in a special flood hazard area, for the full unpaid principal balance of the loan and any prior liens on the property securing the loan, up to the maximum policy limits set under the National Flood Insurance Program, or as otherwise required by Lender, and to maintain such insurance for the term of the loan.

**Application of Proceeds.** Grantor shall promptly notify Lender of any loss or damage to the Property. Lender may make proof of loss if Grantor fails to do so within fifteen (15) days of the casualty. Whether or not Lender's security is impaired, Lender may, at Lender's election, receive and retain the proceeds of any insurance and apply the proceeds to the reduction of the Indebtedness, payment of any lien affecting the Property, or the restoration and repair of the Property. If Lender elects to apply the proceeds to restoration and repair, Grantor shall repair or replace the damaged or destroyed Improvements in a manner satisfactory to Lender. Lender shall, upon satisfactory proof of such expenditure, pay or reimburse Grantor from the proceeds for the reasonable cost of repair or restoration if Grantor is not in default under this Mortgage. Any proceeds which have not been disbursed within 180 days after their receipt and which Lender has not committed to the repair or restoration of the Property shall be used first to pay any amount owing to Lender under this Mortgage, then to pay accrued interest, and the remainder, if any, shall be applied to the principal balance of the Indebtedness. If Lender holds any proceeds after payment in full of the Indebtedness, such proceeds shall be paid to Grantor as Grantor's interests may appear.

**LENDER'S EXPENDITURES.** If any action or proceeding is commenced that would materially affect Lender's interest in the Property or if Grantor fails to comply with any provision of this Mortgage or any Related Documents, including but not limited to Grantor's failure to discharge or pay when due any amounts Grantor is required to discharge or pay under this Mortgage or any Related Documents, Lender on Grantor's behalf may (but shall not be obligated to) take any action that Lender deems appropriate, including but not limited to discharging or paying all taxes, liens, security interests, encumbrances and other claims, at any time levied or placed on the Property and paying all costs for insuring, maintaining and preserving the Property. All such expenditures incurred or paid by Lender for such purposes will then bear interest at the rate charged under the Note from the date incurred or paid by Lender to the date of repayment by Grantor. All such expenses will become a part of the Indebtedness and, at Lender's option, will (A) be payable on demand; (B) be added to the balance of the Note and be apportioned among and be payable with any installment payments to become due during either (1) the term of any applicable insurance policy; or (2) the remaining term of the Note; or (C) be treated as a balloon payment which will be due and payable at the Note's maturity. The Mortgage

# MORTGAGE
## (Continued)

Page 4

also will secure payment of these amounts. Such right shall be in addition to all other rights and remedies to which Lender may be entitled upon Default. Grantor's obligation to Lender for all such expenses shall survive the entry of any mortgage foreclosure judgment.

**WARRANTY; DEFENSE OF TITLE.** The following provisions relating to ownership of the Property are a part of this Mortgage:

**Title.** Grantor warrants that: (a) Grantor holds good and marketable title of record to the Property in fee simple, free and clear of all liens and encumbrances other than those set forth in the Real Property description or in any title insurance policy, title report, or final title opinion issued in favor of, and accepted by, Lender in connection with this Mortgage, and (b) Grantor has the full right, power, and authority to execute and deliver this Mortgage to Lender.

**Defense of Title.** Subject to the exception in the paragraph above, Grantor warrants and will forever defend the title to the Property against the lawful claims of all persons. In the event any action or proceeding is commenced that questions Grantor's title or the interest of Lender under this Mortgage, Grantor shall defend the action at Grantor's expense. Grantor may be the nominal party in such proceeding, but Lender shall be entitled to participate in the proceeding and to be represented in the proceeding by counsel of Lender's own choice, and Grantor will deliver, or cause to be delivered, to Lender such instruments as Lender may request from time to time to permit such participation.

**Compliance With Laws.** Grantor warrants that the Property and Grantor's use of the Property complies with all existing applicable laws, ordinances, and regulations of governmental authorities.

**Survival of Representations and Warranties.** All representations, warranties, and agreements made by Grantor in this Mortgage shall survive the execution and delivery of this Mortgage, shall be continuing in nature, and shall remain in full force and effect until such time as Grantor's Indebtedness shall be paid in full.

**CONDEMNATION.** The following provisions relating to condemnation proceedings are a part of this Mortgage:

**Proceedings.** If any proceeding in condemnation is filed, Grantor shall promptly notify Lender in writing, and Grantor shall promptly take such steps as may be necessary to defend the action and obtain the award. Grantor may be the nominal party in such proceeding, but Lender shall be entitled to participate in the proceeding and to be represented in the proceeding by counsel of its own choice, and Grantor will deliver or cause to be delivered to Lender such instruments and documentation as may be requested by Lender from time to time to permit such participation.

**Application of Net Proceeds.** If all or any part of the Property is condemned by eminent domain proceedings or by any proceeding or purchase in lieu of condemnation, Lender may at its election require that all or any portion of the net proceeds of the award be applied to the Indebtedness or the repair or restoration of the Property. The net proceeds of the award shall mean the award after payment of all actual costs, expenses, and attorneys' fees incurred by Lender in connection with the condemnation.

**IMPOSITION OF TAXES, FEES AND CHARGES BY GOVERNMENTAL AUTHORITIES.** The following provisions relating to governmental taxes, fees and charges are a part of this Mortgage:

**Current Taxes, Fees and Charges.** Upon request by Lender, Grantor shall execute such documents in addition to this Mortgage and take whatever other action is requested by Lender to perfect and continue Lender's lien on the Real Property. Grantor shall reimburse Lender for all taxes, as described below, together with all expenses incurred in recording, perfecting or continuing this Mortgage, including without limitation all taxes, fees, documentary stamps, and other charges for recording or registering this Mortgage.

**Taxes.** The following shall constitute taxes to which this section applies: (1) a specific tax upon this type of Mortgage or upon all or any part of the Indebtedness secured by this Mortgage; (2) a specific tax on Grantor which Grantor is authorized or required to deduct from payments on the Indebtedness secured by this type of Mortgage; (3) a tax on this type of Mortgage chargeable against the Lender or the holder of the Note; and (4) a specific tax on all or any portion of the Indebtedness or on payments of principal and interest made by Grantor.

**Subsequent Taxes.** If any tax to which this section applies is enacted subsequent to the date of this Mortgage, this event shall have the same effect as an Event of Default, and Lender may exercise any or all of its available remedies for an Event of Default as provided below unless Grantor either (1) pays the tax before it becomes delinquent, or (2) contests the tax as provided above in the Taxes and Liens section and deposits with Lender cash or a sufficient corporate surety bond or other security satisfactory to Lender.

**SECURITY AGREEMENT; FINANCING STATEMENTS.** The following provisions relating to this Mortgage as a security agreement are a part of this Mortgage:

**Security Agreement.** This instrument shall constitute a Security Agreement to the extent any of the Property constitutes fixtures, and Lender shall have all of the rights of a secured party under the Uniform Commercial Code as amended from time to time.



# MORTGAGE
## (Continued)

**Security Interest.** Upon request by Lender, Grantor shall take whatever action is requested by Lender to perfect and continue Lender's security interest in the Rents and Personal Property. In addition to recording this Mortgage in the real property records, Lender may, at any time and without further authorization from Grantor, file executed counterparts, copies or reproductions of this Mortgage as a financing statement. Grantor shall reimburse Lender for all expenses incurred in perfecting or continuing this security interest. Upon default, Grantor shall not remove, sever or detach the Personal Property from the Property. Upon default, Grantor shall assemble any Personal Property not affixed to the Property in a manner and at a place reasonably convenient to Grantor and Lender and make it available to Lender within three (3) days after receipt of written demand from Lender to the extent permitted by applicable law.

**Addresses.** The mailing addresses of Grantor (debtor) and Lender (secured party) from which information concerning the security interest granted by this Mortgage may be obtained (each as required by the Uniform Commercial Code) are as stated on the first page of this Mortgage.

**FURTHER ASSURANCES; ADDITIONAL AUTHORIZATIONS.** The following provisions relating to further assurances and additional authorizations are a part of this Mortgage:

**Further Assurances.** At any time, and from time to time, upon request of Lender, Grantor will make, execute and deliver, or will cause to be made, executed or delivered, to Lender or to Lender's designee, and when requested by Lender, cause to be filed, recorded, refiled, or rerecorded, as the case may be, at such times and in such offices and places as Lender may deem appropriate, any and all such mortgages, deeds of trust, security deeds, security agreements, financing statements, continuation statements, instruments of further assurance, certificates, and other documents as may, in the sole opinion of Lender, be necessary or desirable in order to effectuate, complete, perfect, continue, or preserve (1) Grantor's obligations under the Note, this Mortgage, and the Related Documents, and (2) the liens and security interests created by this Mortgage as first and prior liens on the Property, whether now owned or hereafter acquired by Grantor. Unless prohibited by law or Lender agrees to the contrary in writing, Grantor shall reimburse Lender for all costs and expenses incurred in connection with the matters referred to in this paragraph.

**Additional Authorizations.** If Grantor fails to do any of the things referred to in the preceding paragraph, Lender may do so for and in the name of Grantor and at Grantor's expense. For such purposes, Grantor hereby irrevocably authorizes Lender to make, execute, deliver, file, record and do all other things as may be necessary or desirable, in Lender's sole opinion, to accomplish the matters referred to in the preceding paragraph. It is understood that nothing set forth herein shall require Lender to take any such actions.

**FULL PERFORMANCE.** If Grantor pays all the Indebtedness when due, and otherwise performs all the obligations imposed upon Grantor under this Mortgage, Lender shall execute and deliver to Grantor a suitable satisfaction of this Mortgage and suitable statements of termination of any financing statement on file evidencing Lender's security interest in the Rents and the Personal Property. Grantor will pay, if permitted by applicable law, any reasonable termination fee as determined by Lender from time to time.

**EVENTS OF DEFAULT.** Each of the following, at Lender's option, shall constitute an Event of Default under this Mortgage:

**Payment Default.** Grantor fails to make any payment when due under the Indebtedness.

**Default on Other Payments.** Failure of Grantor within the time required by this Mortgage to make any payment for taxes or insurance, or any other payment necessary to prevent filing of or to effect discharge of any lien.

**Other Defaults.** Grantor fails to comply with or to perform any other term, obligation, covenant or condition contained in this Mortgage or in any of the Related Documents or to comply with or to perform any term, obligation, covenant or condition contained in any other agreement between Lender and Grantor.

**False Statements.** Any warranty, representation or statement made or furnished to Lender by Grantor or on Grantor's behalf under this Mortgage or the Related Documents is false or misleading in any material respect, either now or at the time made or furnished or becomes false or misleading at any time thereafter.

**Defective Collateralization.** This Mortgage or any of the Related Documents ceases to be in full force and effect (including failure of any collateral document to create a valid and perfected security interest or lien) at any time and for any reason.

**Death or Insolvency.** The death of Grantor, the insolvency of Grantor, the appointment of a receiver for any part of Grantor's property, any assignment for the benefit of creditors, any type of creditor workout, or the commencement of any proceeding under any bankruptcy or insolvency laws by or against Grantor.

**Creditor or Forfeiture Proceedings.** Commencement of foreclosure or forfeiture proceedings, whether by judicial proceeding, self-help, repossession or any other method, by any creditor of Grantor or by any governmental agency against any property securing the Indebtedness. This includes a garnishment of any of Grantor's accounts, including deposit accounts, with Lender. However, this Event of Default shall not apply if there is a good faith

## MORTGAGE
### (Continued)

dispute by Grantor as to the validity or reasonableness of the claim which is the basis of the creditor or forfeiture proceeding and if Grantor gives Lender written notice of the creditor or forfeiture proceeding and deposits with Lender monies or a surety bond for the creditor or forfeiture proceeding, in an amount determined by Lender, in its sole discretion, as being an adequate reserve or bond for the dispute.

**Breach of Other Agreement.** Any breach by Grantor under the terms of any other agreement between Grantor and Lender that is not remedied within any grace period provided therein, including without limitation any agreement concerning any indebtedness or other obligation of Grantor to Lender, whether existing now or later.

**Events Affecting Guarantor.** Any of the preceding events occurs with respect to any guarantor, endorser, surety, or accommodation party of any of the Indebtedness or any guarantor, endorser, surety, or accommodation party dies or becomes incompetent, or revokes or disputes the validity of, or liability under, any Guaranty of the Indebtedness. In the event of a death, Lender, at its option, may, but shall not be required to, permit the guarantor's estate to assume unconditionally the obligations arising under the guaranty in a manner satisfactory to Lender, and, in doing so, cure any Event of Default.

**Adverse Change.** A material adverse change occurs in Grantor's financial condition, or Lender believes the prospect of payment or performance of the Indebtedness is impaired.

**Right to Cure.** If any default, other than a default in payment is curable and if Grantor has not been given a notice of a breach of the same provision of this Mortgage within the preceding twelve (12) months, it may be cured if Grantor, after receiving written notice from Lender demanding cure of such default: (1) cures the default within sixteen (16) days; or (2) if the cure requires more than sixteen (16) days, immediately initiates steps which Lender deems in Lender's sole discretion to be sufficient to cure the default and thereafter continues and completes all reasonable and necessary steps sufficient to produce compliance as soon as reasonably practical.

**RIGHTS AND REMEDIES ON DEFAULT.** Upon the occurrence of an Event of Default and at any time thereafter, Lender, at Lender's option, may exercise any one or more of the following rights and remedies, in addition to any other rights or remedies provided by law:

**Accelerate Indebtedness.** Lender shall have the right at its option, after giving such notices as required by applicable law, to declare the entire Indebtedness immediately due and payable.

**UCC Remedies.** With respect to all or any part of the Personal Property, Lender shall have all the rights and remedies of a secured party under the Uniform Commercial Code.

**Collect Rents.** Lender shall have the right, without notice to Grantor, to take possession of the Property and collect the Rents, including amounts past due and unpaid, and apply the net proceeds, over and above Lender's costs, against the Indebtedness. In furtherance of this right, Lender may require any tenant or other user of the Property to make payments of rent or use fees directly to Lender. If the Rents are collected by Lender, then Grantor irrevocably authorizes Lender to endorse instruments received in payment thereof in the name of Grantor and to negotiate the same and collect the proceeds. Payments by tenants or other users to Lender in response to Lender's demand shall satisfy the obligations for which the payments are made, whether or not any proper grounds for the demand existed. Lender may exercise its rights under this subparagraph either in person, by agent, or through a receiver.

**Appoint Receiver.** Lender shall have the right to have a receiver appointed to take possession of all or any part of the Property, with the power to protect and preserve the Property, to operate the Property preceding foreclosure or sale, and to collect the Rents from the Property and apply the proceeds, over and above the cost of the receivership, against the Indebtedness. The receiver may serve without bond if permitted by law. Lender's right to the appointment of a receiver shall exist whether or not the apparent value of the Property exceeds the Indebtedness by a substantial amount. Employment by Lender shall not disqualify a person from serving as a receiver.

**Judicial Foreclosure.** Lender may obtain a judicial decree foreclosing Grantor's interest in all or any part of the Property.

**Possession of the Property.** For the purpose of procuring possession of the Property, Grantor hereby authorizes and empowers any attorney of any court of record in the Commonwealth of Pennsylvania or elsewhere, as attorney for Lender and all persons claiming under or through Lender, to sign an agreement for entering in any competent court an amicable action in ejectment for possession of the Property and to appear for and confess judgment against Grantor, and against all persons claiming under or through Grantor, for the recovery by Lender of possession of the Property, without any stay of execution, for which this Mortgage, or a copy of this Mortgage verified by affidavit, shall be a sufficient warrant; and thereupon a writ of possession may be issued forthwith, without any prior writ or proceeding whatsoever.

**Nonjudicial Sale.** If permitted by applicable law, Lender may foreclose Grantor's interest in all or in any part of the Personal Property or the Real Property by non-judicial sale.

# MORTGAGE
## (Continued)

**Deficiency Judgment.** Lender may obtain a judgment for any deficiency remaining in the Indebtedness due to Lender after application of all amounts received from the exercise of the rights provided in this section.

**Tenancy at Sufferance.** If Grantor remains in possession of the Property after the Property is sold as provided above or Lender otherwise becomes entitled to possession of the Property upon default of Grantor, Grantor shall become a tenant at sufferance of Lender or the purchaser of the Property and shall, at Lender's option, either (1) pay a reasonable rental for the use of the Property, or (2) vacate the Property immediately upon the demand of Lender.

**Other Remedies.** Lender shall have all other rights and remedies provided in this Mortgage or the Note or available at law or in equity.

**Sale of the Property.** To the extent permitted by applicable law, Grantor hereby waives any and all right to have the Property marshalled. In exercising its rights and remedies, Lender shall be free to sell all or any part of the Property together or separately, in one sale or by separate sales. Lender shall be entitled to bid at any public sale on all or any portion of the Property.

**Notice of Sale.** Lender shall give Grantor reasonable notice of the time and place of any public sale of the Personal Property or of the time after which any private sale or other intended disposition of the Personal Property is to be made. Unless otherwise required by applicable law, reasonable notice shall mean notice given at least ten (10) days before the time of the sale or disposition. Any sale of the Personal Property may be made in conjunction with any sale of the Real Property.

**Election of Remedies.** Election by Lender to pursue any remedy shall not exclude pursuit of any other remedy, and an election to make expenditures or to take action to perform an obligation of Grantor under this Mortgage, after Grantor's failure to perform, shall not affect Lender's right to declare a default and exercise its remedies. Nothing under this Mortgage or otherwise shall be construed so as to limit or restrict the rights and remedies available to Lender following an Event of Default, or in any way to limit or restrict the rights and ability of Lender to proceed directly against Grantor and/or against any other co-maker, guarantor, surety or endorser and/or to proceed against any other collateral directly or indirectly securing the Indebtedness.

**Attorneys' Fees; Expenses.** If Lender institutes any suit or action to enforce any of the terms of this Mortgage, Lender shall be entitled to recover such sum as the court may adjudge reasonable as attorneys' fees at trial and upon any appeal. Whether or not any court action is involved, and to the extent not prohibited by law, all reasonable expenses Lender incurs that in Lender's opinion are necessary at any time for the protection of its interest or the enforcement of its rights shall become a part of the Indebtedness payable on demand and shall bear interest at the Note rate from the date of the expenditure until repaid. Expenses covered by this paragraph include, without limitation, however subject to any limits under applicable law, Lender's attorneys' fees and Lender's legal expenses, whether or not there is a lawsuit, including attorneys' fees and expenses for bankruptcy proceedings (including efforts to modify or vacate any automatic stay or injunction), appeals, and any anticipated post-judgment collection services, the cost of searching records, obtaining title reports (including foreclosure reports), surveyors' reports, and appraisal fees and title insurance, to the extent permitted by applicable law. Grantor also will pay any court costs, in addition to all other sums provided by law.

**NOTICES.** Unless otherwise provided by applicable law, any notice required to be given under this Mortgage shall be given in writing, and shall be effective when actually delivered, when actually received by telefacsimile (unless otherwise required by law), when deposited with a nationally recognized overnight courier, or, if mailed, when deposited in the United States mail, as first class, certified or registered mail postage prepaid, directed to the addresses shown near the beginning of this Mortgage. All copies of notices of foreclosure from the holder of any lien which has priority over this Mortgage shall be sent to Lender's address, as shown near the beginning of this Mortgage. Any party may change its address for notices under this Mortgage by giving formal written notice to the other parties, specifying that the purpose of the notice is to change the party's address. For notice purposes, Grantor agrees to keep Lender informed at all times of Grantor's current address. Unless otherwise provided by applicable law, if there is more than one Grantor, any notice given by Lender to any Grantor is deemed to be notice given to all Grantors.

**CROSS-COLLATERALIZATION.** In addition to the Note, this Mortgage secures all obligations, debts and liabilities, plus interest thereon, of Borrower or Grantor to Lender, or any one or more of them, as well as all claims by Lender against Borrower or Grantor, or any one or more of them, whether now existing or hereafter arising.

**MISCELLANEOUS PROVISIONS.** The following miscellaneous provisions are a part of this Mortgage:

**Amendments.** This Mortgage, together with any Related Documents, constitutes the entire understanding and agreement of the parties as to the matters set forth in this Mortgage. No alteration of or amendment to this Mortgage shall be effective unless given in writing and signed by the party or parties sought to be charged or bound by the alteration or amendment.

**Annual Reports.** If the Property is used for purposes other than Grantor's residence, Grantor shall furnish to Lender, upon request, a certified statement of net operating income received from the Property during Grantor's

**MORGAGE**
**(Continued)**

previous fiscal year in such form and detail as Lender shall require. "Net operating income" shall mean all cash receipts from the Property less all cash expenditures made in connection with the operation of the Property.

**Caption Headings.** Caption headings in this Mortgage are for convenience purposes only and are not to be used to interpret or define the provisions of this Mortgage.

**Joint and Several Liability.** All obligations of Grantor under this Mortgage shall be joint and several, and all references to Grantor shall mean each and every Grantor. This means that each Grantor signing below is responsible for all obligations in this Mortgage.

**No Waiver by Lender.** Lender shall not be deemed to have waived any rights under this Mortgage unless such waiver is given in writing and signed by Lender. No delay or omission on the part of Lender in exercising any right shall operate as a waiver of such right or any other right. A waiver by Lender of a provision of this Mortgage shall not prejudice or constitute a waiver of Lender's right otherwise to demand strict compliance with that provision or any other provision of this Mortgage. No prior waiver by Lender, nor any course of dealing between Lender and Grantor, shall constitute a waiver of any of Lender's rights or of any of Grantor's obligations as to any future transactions. Whenever the consent of Lender is required under this Mortgage, the granting of such consent by Lender in any instance shall not constitute continuing consent to subsequent instances where such consent is required and in all cases such consent may be granted or withheld in the sole discretion of Lender.

**Severability.** If a court of competent jurisdiction finds any provision of this Mortgage to be illegal, invalid, or unenforceable as to any person or circumstance, that finding shall not make the offending provision illegal, invalid, or unenforceable as to any other person or circumstance. If feasible, the offending provision shall be considered modified so that it becomes legal, valid and enforceable. If the offending provision cannot be so modified, it shall be considered deleted from this Mortgage. Unless otherwise required by law, the illegality, invalidity, or unenforceability of any provision of this Mortgage shall not affect the legality, validity or enforceability of any other provision of this Mortgage.

**Merger.** There shall be no merger of the interest or estate created by this Mortgage with any other interest or estate in the Property at any time held by or for the benefit of Lender in any capacity, without the written consent of Lender.

**Successor Interests.** The terms of this Mortgage shall be binding upon Grantor, and upon Grantor's heirs, personal representatives, successors, and assigns, and shall be enforceable by Lender and its successors and assigns.

**Time is of the Essence.** Time is of the essence in the performance of this Mortgage.

**DEFINITIONS.** The following capitalized words and terms shall have the following meanings when used in this Mortgage. Unless specifically stated to the contrary, all references to dollar amounts shall mean amounts in lawful money of the United States of America. Words and terms used in the singular shall include the plural, and the plural shall include the singular, as the context may require. Words and terms not otherwise defined in this Mortgage shall have the meanings attributed to such terms in the Uniform Commercial Code:

**Borrower.** The word "Borrower" means Larry L Wisser and Cathleen R Wisser and includes all co-signers and co-makers signing the Note and all their successors and assigns.

**Default.** The word "Default" means the Default set forth in this Mortgage in the section titled "Default".

**Environmental Laws.** The words "Environmental Laws" mean any and all state, federal and local statutes, regulations and ordinances relating to the protection of human health or the environment, including without limitation the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, as amended, 42 U.S.C. Section 9601, et seq. ("CERCLA"), the Superfund Amendments and Reauthorization Act of 1986, Pub. L. No. 99-499 ("SARA"), the Hazardous Materials Transportation Act, 49 U.S.C. Section 1801, et seq., the Resource Conservation and Recovery Act, 42 U.S.C. Section 6901, et seq., or other applicable state or federal laws, rules, or regulations adopted pursuant thereto.

**Event of Default.** The words "Event of Default" mean any of the events of default set forth in this Mortgage in the events of default section of this Mortgage.

**Grantor.** The word "Grantor" means Larry L Wisser and Cathleen R Wisser.

**Guaranty.** The word "Guaranty" means the guaranty from guarantor, endorser, surety, or accommodation party to Lender, including without limitation a guaranty of all or part of the Note.

**Hazardous Substances.** The words "Hazardous Substances" mean materials that, because of their quantity, concentration or physical, chemical or infectious characteristics, may cause or pose a present or potential hazard to human health or the environment when improperly used, treated, stored, disposed of, generated, manufactured, transported or otherwise handled. The words "Hazardous Substances" are used in their very broadest sense and include without limitation any and all hazardous or toxic substances, materials or waste as defined by or listed under the Environmental Laws. The term "Hazardous Substances" also includes, without limitation, petroleum and

**MORGTGAGE**
**(Continued)**                                                      Page 9

petroleum by-products or any fraction thereof and asbestos.

**Improvements.** The word "Improvements" means all existing and future improvements, buildings, structures, mobile homes affixed on the Real Property, facilities, additions, replacements and other construction on the Real Property.

**Indebtedness.** The word "Indebtedness" means all principal, interest, and other amounts, costs and expenses payable under the Note or Related Documents, together with all renewals of, extensions of, modifications of, consolidations of and substitutions for the Note or Related Documents and any amounts expended or advanced by Lender to discharge Grantor's obligations or expenses incurred by Lender to enforce Grantor's obligations under this Mortgage, together with interest on such amounts as provided in this Mortgage.

**Lender.** The word "Lender" means Union National Community Bank, its successors and assigns.

**Mortgage.** The word "Mortgage" means this Mortgage between Grantor and Lender.

**Note.** The word "Note" means the promissory note dated June 1, 2006, **in the original principal amount of $465,000.00** from Grantor to Lender, together with all renewals of, extensions of, modifications of, refinancings of, consolidations of, and substitutions for the promissory note or agreement. **NOTICE TO GRANTOR: THE NOTE CONTAINS A VARIABLE INTEREST RATE.**

**Personal Property.** The words "Personal Property" mean all equipment, fixtures, and other articles of personal property now or hereafter owned by Grantor, and now or hereafter attached or affixed to the Real Property; together with all accessions, parts, and additions to, all replacements of, and all substitutions for, any of such property; and together with all proceeds (including without limitation all insurance proceeds and refunds of premiums) from any sale or other disposition of the Property.

**Property.** The word "Property" means collectively the Real Property and the Personal Property.

**Real Property.** The words "Real Property" mean the real property, interests and rights, as further described in this Mortgage.

**Related Documents.** The words "Related Documents" mean all promissory notes, credit agreements, loan agreements, environmental agreements, guaranties, security agreements, mortgages, deeds of trust, security deeds, collateral mortgages, and all other instruments, agreements and documents, whether now or hereafter existing, executed in connection with the Indebtedness.

**Rents.** The word "Rents" means all present and future rents, revenues, income, issues, royalties, profits, and other benefits derived from the Property.

EACH GRANTOR ACKNOWLEDGES HAVING READ ALL THE PROVISIONS OF THIS MORTGAGE, AND EACH GRANTOR AGREES TO ITS TERMS.

THIS MORTGAGE IS GIVEN UNDER SEAL AND IT IS INTENDED THAT THIS MORTGAGE IS AND SHALL CONSTITUTE AND HAVE THE EFFECT OF A SEALED INSTRUMENT ACCORDING TO LAW.

GRANTOR:

X _Larry L Wisser_ (Seal)
Larry L Wisser

X _Cathleen R Wisser_ (Seal)
Cathleen R Wisser

Signed, acknowledged and delivered in the presence of:

X _____
Witness

X _Abby F Wenar_
Witness

## MORTGAGE
## (Continued)

Page 10

---

### CERTIFICATE OF RESIDENCE

I hereby certify, that the precise address of the mortgagee, **Union National Community Bank**, herein is as follows:

HACC Gold Cafe, 1625 Old Philadelphia Pike, Lancaster, PA  17602

_Abby FWendel_
Attorney   or Agent   for Mortgagee

---

### INDIVIDUAL ACKNOWLEDGMENT

COMMONWEALTH OF PENNSYLVANIA                                    )
                                                                                        ) SS
COUNTY OF _Lancaster_                                              )

On this, the _21st_ day of _June_ , 20 _06_ , before me _____
_Abby F Wendel_ , the undersigned Notary Public, personally appeared **Larry L Wisser and Cathleen R Wisser**, known to me (or satisfactorily proven) to be the person whose names are subscribed to the within instrument, and acknowledged that they executed the same for the purposes therein contained.

**In witness whereof, I hereunto set my hand and official seal.**

COMMONWEALTH OF PENNSYLVANIA
NOTARIAL SEAL
ABBY F WENDEL, Notary Public
East Hempfield Twp., Lancaster County
My Commission Expires August 23, 2008

_Abby F Wendel_
Notary Public in and for the State of _PA_

LASER PRO Lending, Ver. 5.31.00.004  Copr. Harland Financial Solutions, Inc. 1997, 2006.  All Rights Reserved.   - PA  C:\CFI\LPL\G03.FC  TR-10138  PR-68

I hereby CERTIFY that this document is
recorded in the Recorder's Office of
Lehigh County, Pennsylvania



_Marie Dean_

Marie Dean
Recorder of Deeds

7351866
**Page: 12 of 12**
07/05/2006 12:57PM